678 P.2d 1170

**CITY OF RATON, New Mexico, a municipal corporation, Plaintiff-Appellant,**

v.

**VERMEJO CONSERVANCY DISTRICT, a corporation, Defendant-Appellee.**

No. 14773.

Supreme Court of New Mexico.

March 29, 1984.

Neil Stillinger, Watson, Stillinger & Lunt, Sarah Michael Singleton, Santa Fe, for defendant-appellee.

Robert S. Skinner, Raton, Moses, Wittemyer, Harrison & Woodruff, Boulder, Colo., for plaintiff-appellant.

## OPINION

WALTERS, Justice.

In 1935 the Colfax County District Court issued a decree adjudicating water rights in the Chico Rico, or Sugarite, stream system of Northern Colfax County. In 1980 the City of Raton (Raton) filed a declaratory judgment action against Vermejo Conservancy District (District) seeking a determination of the rights of those parties under the 1935 decree. The District counterclaimed, basing its claims on Raton's alleged improper withholding of water in excess of its senior rights. Trial was held in two parts—on August 20, 1981, the court decided Raton's claimed equitable defenses to the District's call for release of water (Phase I), and on July 20, 1982, it determined the damages and injunction issues raised by the District's counterclaim (Phase II). The trial court, in its final declaratory judgment entered December 9, 1982, ordered Raton to release water to the District upon demand in accordance with the senior rights of the District established in the 1935 decree, so long as the water could be put to beneficial use by the District. The trial court, as the measure of damage, also ordered Raton to make a one-time release to the District of 1,211 acre-feet of water wrongfully withheld in 1980.

Raton appealed the decision, asserting three contentions: (1) that the District lost its water rights when its method of storage was altered; (2) that the doctrine of laches precludes an assertion by the District of its senior rights and raises the issue of abandonment; and (3) that the trial court improperly interpreted the 1935 decree in determining the quantity of water available to Raton.

We summarize the uncontested facts found by the trial court: The final decree of water rights on the Chico Rico was entered on September 25, 1935. Among the parties to the adjudication were Raton and the District's predecessor in interest, Maxwell Ditch and Reservoir Company (Maxwell). The district court found, among other things, that Maxwell had the right to divert and store up to 15,638 acre-

feet of water per year at Hebron Reservoir, with a priority date of August 17, 1911. Under the court's findings, Raton also had certain water rights with a priority date of January 1, 1891, and other water rights with a priority date of August 22, 1912.

Hebron Dam broke in 1942. As originally constructed, it had a reservoir capacity of 7800 acre-feet; when it broke, its storage capacity was reduced to 3,073 acre-feet because of siltation. Hebron Dam has not been rebuilt.

Following the break of Hebron Dam, the United States Bureau of Reclamation undertook an engineering study of the area. The Vermejo Project was ultimately authorized as a federal reclamation project and two million dollars were expended in rehabilitation of the irrigation dams, reservoirs and ditch system formerly operated by Maxwell. Part of the rehabilitation included the Eagle Tail Ditch by which water is carried from the Hebron Dam site to irrigated lands some 15½ miles away, and the Eagle Tail Diversion canal was moved from its prior location at Hebron Dam to the north end of Hebron Reservoir. No significant amount of water has been stored in Hebron Reservoir since 1942.

The Vermejo Conservancy District, successor in interest to Maxwell, was organized in 1952 under the laws of the State of New Mexico. The District maintains and operates the Vermejo Project pursuant to a 1952 repayment contract with the Bureau of Reclamation. The Vermejo Project encompasses 7,380 acres of land which are irrigated in part by waters of the Chico Rico stream system.

Although, since 1938, neither the District nor its predecessor Maxwell had received all the water of the Chico Rico at the Hebron diversion to which they were entitled, at no time prior to 1980 had either made a priority call on Raton. On May 28, 1980, the District made such a priority call, demanding that all waters stored in Raton's reservoirs in excess of Raton's storage rights under the 1935 decree be re-

leased from storage and allowed to flow downstream. It was this 1980 call that prompted Raton to file the declaratory judgment action.

**1. District's compliance with statutes**

The trial court found that "[e]xcept for storage" the District's method of collection, diversion, and distribution of the waters of the Chico Rico is "essentially unchanged" from the method used by Maxwell prior to the destruction of Hebron Dam in 1942. Raton argues here, citing NMSA 1978, § 72–5–24, that because there was a change in the method of storage following the rehabilitation undertaken by the Bureau of Reclamation, the District was required to apply to the State Engineer for approval of that change. Section 72–5–24 is a restriction of the rights of an appropriator to change the method of water storage. *See Public Service Co. v. Reynolds,* 68 N.M. 54, 358 P.2d 621 (1960). We agree with Raton that normally the District would have had to obtain the State Engineer's approval for the change in storage. However, the trial court concluded that, under NMSA 1978, § 72–9–4, neither Maxwell nor the United States Bureau of Reclamation was required to obtain the State Engineer's approval in order to implement the plan for rehabilitation for the Vermejo Project. Section 72–9–4 provides as follows:

> Except as provided in Sections 15 and 22 [72–5–33 and 19–7–26, NMSA 1978] of this act nothing herein shall be construed as applying to or in any way affecting any federal reclamation project heretofore or hereafter constructed pursuant to the act of congress approved June 17, 1902, now as the Federal Reclamation Act, or acts amendatory thereof or supplementary thereto.

Raton does not dispute that the Vermejo Project was a federal reclamation project pursuant to the Federal Reclamation Act. Raton argues that Section 72–9–4 does not provide an exemption from the requirements of Section 72–5–24.

Section 72–9–4 was enacted in 1941 N.M.Laws, ch. 126, § 27. Section 72–5–24 was enacted as Section 18 of that chapter. Chapter 126 was prefaced, "An act to conserve and regulate the use and distribution of the waters of New Mexico * * *." All of Chapter 126 is clearly "the act" referred to in Section 72–9–4. Thus, the requirements of Section 72–5–24, enacted as Section 18 of that "act," do not apply to federal reclamation projects. Even so, the evidence shows that the District applied to the State Engineer in 1978 for approval of the changes made by the Bureau of Reclamation in the District's storage system, and the State Engineer's office replied that the application was unnecessary in view of Section 72–9–4. Although not binding, the statutory interpretations of the body charged with administration of the statute are persuasive. *Valley Country Club v. Mender,* 64 N.M. 59, 323 P.2d 1099 (1958). The State Engineer's interpretation here coincides with ours. The Vermejo Project was authorized as a federal reclamation project; consequently, the District was exempted from the requirements of Section 72–5–24 by the very terms of Section 72–9–4 with respect to changes in the system effected by the Bureau of Reclamation.

In its Reply Brief, Raton cites N.M. Const. art. 2, § 18, and argues that if we interpret Section 72–9–4 as we do, it is a denial of equal protection to those New Mexico appropriators of water not affected by a federal reclamation project. Aside from the unacceptable practice of raising issues for the first time in reply briefs, *Montgomery v. Karavas,* 45 N.M. 287, 114 P.2d 776 (1941), "[t]o show a violation of equal protection, appellants must demonstrate that the legislation was clearly arbitrary and unreasonable .... Courts must uphold the efficacy of statutes unless they are satisfied beyond all reasonable doubt that the legislature went outside the Constitution in enacting the challenged legislation." *Gallegos v. Homestake Mining Co.,* 97 N.M. 717, 722–23, 643 P.2d 281, 286–87 (Ct.App.1982). The legislature's distinction between federal reclamation projects and

other areas of water use in this state is not at all unreasonable or arbitrary. It recognizes the federal interest in projects intended to conserve or preserve water availability. *See* 43 U.S.C. §§ 371–573 (Cum.Supp. 1958 & 1983); NMSA 1978, § 73–18–2. Thus, even if properly raised, Raton's constitutional argument does not withstand the arbitrary and unreasonable test.

### 2. Abandonment; Laches

### A. Abandonment

The trial court concluded that, because of the provisions of NMSA 1978, § 73–17–21, the District could not lose its water rights or its priority by abandonment. That statute provides:

> The rights of the [conservancy] district to the waters of the district, or the use thereof, or the land within the district and property owned by it shall not be lost by the district by prescription or by adverse possession, or for nonuse of the waters.

Raton contends that Section 73–17–21 does not preclude abandonment of the right to make a call. Again, in its Reply Brief it raises the contention that the section violates the equal protection clause of the New Mexico Constitution, N.M. Const. art. 2, § 18, because it improperly distinguishes between the protection of a conservancy district's rights and the loss of rights to which other appropriators of water are exposed by reason of non-use.

■ We agree with the trial court's conclusion that this section precludes abandonment of the conservancy district's priority by non-use. In a prior appropriation system the right to use a certain quantity of water is inextricably linked to the priority date of that right. Loss of the priority date is often tantamount to loss of the water right. "The priority date is of paramount importance since it gives an appropriation its chief value." ·5 R. Clark, Waters and Water Rights § 410.1, at 119 (1972). Because Section 73–17–21 prevents the loss of the water rights *and* the loss of the *use* of the rights, we interpret that

Section to deny a claim of abandonment of a conservancy district's priority rights over other users of the same stream system by reason of non-use.

■ Section 73–17–21 does not violate the equal protection clause of the New Mexico Constitution. The legislature's distinction between conservancy districts and other appropriators with respect to the loss of water rights through nonuse is neither unreasonable nor arbitrary. The legislature has created an entire body of law pertaining specifically to conservancy districts for the purpose of providing and maintaining flood protection, river control, drainage, water storage for irrigation needs and constructing and maintaining distribution systems. Thus, the state's unique and extensive regulation of such districts ensures maximum beneficial use of water. *See* NMSA 1978, § 73–14–1 to 73–19–5. Section 73–17–21 is a rational part of that scheme.

### B. Laches

■ Raton urges that the equitable doctrine of laches should be applied to prevent the District from exercising those of its water rights senior to Raton's. The application of the doctrine of laches, here closely related if not identical to Raton's claim of abandonment, depends upon the circumstances of each case. *State ex rel. Department of Human Services v. Davis,* 99 N.M. 138, 654 P.2d 1038 (1982). There are four elements necessary to establish laches:

> (1) Conduct on the part of the defendant, or of one under whom he claims, giving rise to the situation of which complaint is made and for which the complainant seeks a remedy * * *;
>
> (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit;
>
> (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and

(4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is not held to be barred.

*Morris v. Ross,* 58 N.M. 379, 381–82, 271 P.2d 823, 824–25 (1954) (quoting 19 Am.Jur. *Equity* § 498 (1939)).

 It is Raton's position that the "delay" element was satisfied by the failure of either the District or its predecessor to make a call on Raton prior to 1980 despite the fact that there were periods when the District did not receive the total amount of water to which it was entitled. Raton relies on evidence of its witnesses who were unfamiliar with the 1935 decree to establish that it was not aware of the District's priority, and it points to $3,500,000 spent on its water system "in reliance on the historic operation of the Chico Rico" (Brief in Chief, p. 33) to demonstrate Raton's injury if the District's priority rights were now enforced.

The trial court found that none of the latter three elements of laches had been met. There was expert evidence to support its findings that there were only five years during the period 1945–1980 in which the District could have put to beneficial use Raton's excess storage waters, and that the District had reasonable excuses for not making a call in at least two of those five years because it was unlikely that water released by Raton would have reached the District. The court also found that Raton knew or should have known of the District's priority rights to divert and store water pursuant to the 1935 decree, and that Raton did not spend money on its water system "in reliance upon any conduct or action" by the District.

 The trial court's conclusion that the doctrine of laches should not be applied is supported by findings based on substantial evidence. Raton was a party to the 1935 adjudication. As such, it is charged with knowledge that the decree granted to the District, through its predecessor in interest, certain priority rights to the waters of the Chico Rico. *See Cave v. Cave,* 81 N.M. 797, 474 P.2d 480 (1970). The failure

of the District on three occasions to make a call on Raton when it might have put the water to beneficial use does not constitute the sort of "delay" in asserting a right that would result in the loss of priority, particularly in view of our interpretation of Section 73–17–21. The priority right is too important and the variables which enter into determining whether to make a call on a junior user are too many to declare forfeiture of the priority because the senior appropriator declined to make a call on three occasions when a call might have been warranted. The record shows that on one occasion, it appeared that a call would be futile because released water would have been used by upstream appropriators before it reached the District; on a second occasion, the State Engineer had instructed the District to clean out its system prior to making a call; and on the third occasion, the District decided not to make a call because Raton was rationing water at the time. The trial court correctly concluded that the evidence failed to establish that the District should be barred from exercising its senior priority rights by reason of estoppel or laches.

### 3. Interpretation of the 1935 Decree

During the trial of Phase I, the amount of water to which Raton was entitled under the 1891 priority was not an issue. Raton challenged only whether the District had abandoned or forfeited its senior rights, or was estopped to make a priority call on Raton.

The trial court's determination of the amount of water improperly withheld by Raton in 1980 was dependent upon its interpretation of the 1935 decree insofar as it established Raton's 1891 priority. At the conclusion of Phase I, the trial court made the following Finding 6:

The priorities of the water rights of the City under the Chico Rico decree were adjudicated as follows:

January 1, 1891—City has the right to take by direct diversion up to 1,000,000 gallons per day, and, in addition to this diversion right, it has the right to divert

and store in Lake Dorothy 202 acre-feet, in Lake Maloya 59 acre-feet, and in Lake Alice 100 acre-feet.

Two of the conclusions thereupon made were:

2. Under the Chico Rico decree, the City has the right to take by direct diversion with a priority date of January 1, 1891 up to one million gallons per day, and, in addition to this diversion right, it has the right to divert and store in Lake Dorothy, 250 [sic] acre-feet, in Lake Maloya 59 acre-feet, and in Lake Alice 100 acre-feet.

 * * * * * *

8. The plaintiff is entitled to place into storage only the water diverted under the plaintiff's water rights listed above and the rate at which the plaintiff may take water out of storage from the reservoirs for delivery through the pipe lines to the City is not limited.

At the conclusion of the hearing on Phase II, however, the trial court made additional findings, including Finding 7 which is said by Raton to be inconsistent with the quoted Phase I finding and conclusions: It reads:

In order to determine when water must be released downstream by the Plaintiff to the Defendant in accordance with the above criteria, the senior rights of the Plaintiff shall be as set forth in the findings of fact and conclusions of law contained in the Court's decision of October 8, 1981 and specifically defined as the right with a priority of January 1, 1891 to deliver by and through the Plaintiff's reservoirs 1,000,000 gallons per day (gpd) to the City and to fill and refill at any and all times Lake Alice to a capacity of 100 acre feet, Lake Dorothy to a capacity of 202 acre feet and Lake Moloya [sic] to a capacity of 59 acre feet * * *.

The trial court's determination of damages was based on the interpretation of the 1935 decree as stated in Phase II Finding 7. In addition to claiming inconsistency, Raton says that Phase II Finding 7 is not supported by the evidence. We

would note at the outset that, because the amount of Raton's water entitlement was not a question to be decided in Phase I, Finding 6 and Conclusions 2 and 8 made upon that portion of the case were not necessary to a determination of Raton's equitable defenses to the District's Counterclaim, and error may not be predicated thereon. *Melfi v. Goodman*, 73 N.M. 320, 388 P.2d 50 (1963).

The question Raton seeks to raise under this point is whether the 1935 decree limits Raton's use to 1,000,000 gallons per day (1 MGD) (Phase II, Finding 7) or whether Raton may deliver an additional unlimited amount of storage water to the city (Phase I, Conclusion 8).

In relevant portions, the 1935 decree provided as follows:

3.

That by virtue of said appropriation * * * the said Raton Water Works Company [predecessor to Raton] made a lawful appropriation from said Sugarite stream of one million gallons of water every twenty four hours, delivered into the Town of Raton, subject only to the rights of prior appropriators.

4.

That all of the impounding, storage and distribution works and system constructed and used by the said City of Raton * * * are now merely different units of the same system, and taken together constitute the works and system through which are exercised the water rights of the said City * * *.

5.

That by reason of the findings and conclusions hereinbefore made * * * [Raton] * * * [has and owns] a vested right, with a priority as of January 1, 1891, to divert, impound, store and beneficially use * * * the flood and perrenial [sic] flow waters of the Sugarite or west branch of the Chico Rico stream system, at the times and in the amounts as follows:

(a) Through and by means of the reservoirs and diversion works hereinafter named and designated in subparagraphs (b), (c) and (d) of this Paragraph 5, as said reservoirs and diversion works now exist or may hereafter be lawfully changed or altered, one million gallons of water per day at any and all times during each succeeding year; and

(b) In and by means of said reservoir known as Lake Alice to divert, impound, store and beneficially use the waters of said stream to the full capacity of said reservoir, which has heretofore been adjudged to be approximately one hundred acre feet of water, and to fill and refill said reservoir at any and all times of the year whenever waters of said stream are available therefor, and to beneficially use said waters so at any time diverted into and impounded by said reservoir; and

(c) [Same as "b" above for Lake Dorothy, capacity 202 acre-feet.]

(d) [Same as "b" above for Lake Maloya, capacity 59 acre-feet.]

If Phase I Conclusion 8 is to be construed as Raton contends, *i.e.*, that unless Raton has the right to use more than 1 MGD it will be deprived of the usefulness of its storage rights, there would be no meaning whatever to the language of the 1935 decree or the findings and conclusions in both phases of this suit which refers to the use or delivery of "one million gallons per day." A reasonable reading of Phase I Conclusion 8 would supply the words "to the extent of one million gallons per day," which were implied but omitted from the conclusion. Those omitted words would then clearly give effect to Conclusion 2 by recognizing that if use of 1 MGD were not supplied by direct diversion to the city pipe lines, the supply could be met by delivery to the pipelines from the storage reservoirs, up to the 1 MGD limitation. The reservoirs could be filled and refilled at the diversion rates decreed for each reservoir, as Phase I Conclusion 2 and Phase II Finding 7 provide, as often as necessary to supply the allowable daily delivery solely from the reservoirs if Raton so chose to do.

Any other reading of the 1935 decree, together with the findings and conclusions of both Phase I and Phase II, would make the 1 MGD delivery provisions meaningless, because they could be circumvented whenever Raton chose to use reservoir water by continuous and unlimited diversion and refilling rather than by using direct diversion water.

 Seeming inconsistencies are to be reconciled by the reviewing court, if possible, to avoid what may be challenged as contradictory. *See Hartzell v. Jackson*, 41 N.M. 700, 73 P.2d 820 (1937). Moreover, when the issue to be determined rests upon the interpretation of documentary evidence, this Court is in as good a position as the trial court to determine the facts and draw its own conclusions, *see Atlantic Refining Co. v. Beach*, 78 N.M. 634, 436 P.2d 107 (1968), or, if a conclusion conflicts with or does not follow a finding of fact made by the trial court, the appellate court will apply the proper conclusion of law. *Sachs v. Board of Trustees*, 89 N.M. 712, 557 P.2d 209 (1976). As we have shown above, we have supplied the language that will make the trial court's Phase I Conclusion 8 a proper conclusion of law, and consistent with findings of both Phase I and Phase II and with the provisions of the 1935 decree.

 Therefore, reading all documents, findings and conclusions together, we hold that Raton is limited to diversion and use of one million gallons of water per day, and it is entitled at all times to store in the three named reservoirs an additional 361 acre-feet of water in certain amounts per reservoir. When those limitations are reached, Raton must release water to the District if called upon to do so.

The judgment of the trial court limiting Raton's usage to 1 MGD and awarding damages to the District is affirmed.

IT IS SO ORDERED.

SOSA, Senior Justice, and RIORDAN, J., concur.