904 P.2d 28

**MORNINGSTAR WATER USERS ASSOCIATION, Appellant,**

v.

**NEW MEXICO PUBLIC UTILITY COMMISSION, Appellee.**

No. 21985.

Supreme Court of New Mexico.

Sept. 21, 1995.

Arthur A. Greenfield, Albuquerque, for Appellant.

Lee W. Huffman, Commission Counsel, Santa Fe, for Appellee.

## OPINION

FROST, Justice.

Morningstar Water Users Association, Inc. sought an order to restrain the City of Farmington from invading the Morningstar water supply service territory. The sole question before us is whether the New Mexico Public Utility Commission (Commission) had jurisdiction to grant the order. We review this case under SCRA 12–102(A)(3) (Cum.Supp. 1995) and NMSA 1978, Section 62–11–1 (Repl.Pamp.1993), both of which provide for Supreme Court review of final orders by the Commission. We conclude the Commission had no such jurisdiction.

## I. FACTS

This case arises from the same dispute between Morningstar and Farmington that we addressed in *Morningstar Water Users Association, Inc. v. Farmington Municipal School District No. 5*, 120 N.M. 307, 901 P.2d 725 (1995) [hereinafter *Morningstar I* ]. Morningstar is a water users' association, incorporated under NMSA 1978, §§ 73–5–1 to –9 (Orig.Pamp. & Cum.Supp.1995), that provides water to over 500 member-consumers, all located outside the boundaries of Farmington. Farmington owns a water utility that until recently serviced residents and businesses only within its municipal boundaries. Farmington has now begun to extend its services into a geographical area that had previously been served only by Morningstar.

In discussing Morningstar's "service area" and "territory," we refer only to the general location of Morningstar's member-consumers. We do not imply that Morningstar had a certified service area or territory that was obtained—as will be explained below—through the issuance by the Commission of a certificate of public convenience and necessi-

ty. *See* § 62–9–1. Also, as discussed below, Farmington, like Morningstar, is an unregulated utility and lacks a certified territory within a specific geographical region.

In 1993 Morningstar and Farmington competed for contracts to supply water for a new junior high school that was to be constructed inside Morningstar's service area. Over Morningstar's objections, the contracts were ultimately awarded to Farmington. This dispute was the subject of *Morningstar I.*

On January 24, 1994, a complaint was filed with the Commission in which Morningstar alleged that Farmington was encroaching upon its service area. Morningstar pointed out that in order to provide water to the school Farmington intended to add new pressure zones, and construct a water storage tank, pumping facilities, and water lines, all within Morningstar's territory. In its complaint Morningstar also objected to an alleged agreement in which Farmington would furnish water to land owned by the City of Albuquerque that is located within Morningstar's service area. Morningstar argued that it already had in place the facilities, including pipelines, needed to provide water to the Albuquerque lands. Farmington, on the other hand, could only effectuate the agreement by building through Morningstar's territory. In its request for relief Morningstar sought an immediate hearing before the Commission and a cease and desist order restraining Farmington from invading Morningstar's service territory.

Farmington filed a motion to dismiss arguing that the Commission had no jurisdiction to hear this dispute. Under the Commission's regulations, "[i]f the Commission determines that a cause of action within the jurisdiction of the Commission does not exist ... the Commission will advise the complainant by issuing an Order dismissing the complaint with or without prejudice." Procedure Upon Receipt of a Formal Complaint, 1 N.M.Pub.Util.Comm'n Rule 110.47(b) (Oct. 4, 1993) (flush language) (compiled in Code of Rules and Regulations of the N.M.Pub.Util. Comm'n (1988 Ann.)) [hereinafter NMPUC Rule].

The Commission dismissed the complaint in its final order on February 23, concluding the matter was outside its jurisdiction. Morningstar appealed, arguing that the Commission does indeed, under the Public Utility Act, NMSA 1978, §§ 62–3–1 to –6–27, 62–8–1 to –13–14 (Repl.Pamp.1993 & Cum.Supp. 1995) [hereinafter PUA], have jurisdiction over the dispute, and that, if there were no jurisdiction under the PUA, Morningstar's equal protection rights would be violated. We conclude the Commission has no jurisdiction over this matter and that Morningstar's constitutional rights are not violated. We therefore affirm the Commission.

## II. STANDARD OF REVIEW

The parties disagree about the appropriate standard of review that should be applied when a court reviews an agency's determination of its own jurisdiction. Morningstar argues that the Commission should be given little deference in this matter. The Commission argues that Morningstar bears a heavy burden of overcoming the presumption that the agency has correctly interpreted its statutory jurisdiction. Each party emphasizes different aspects of the standard we are to apply.

■ The party challenging a Commission decision bears the burden on appeal of showing that the decision "is unreasonable, or unlawful." Section 62–11–4. More specifically, the party must show that agency action falls within one of the oft-mentioned grounds for reversal including whether the decision is arbitrary and capricious; whether it is supported by substantial evidence; and whether it represents an abuse of the agency's discretion by being outside the scope of the agency's authority, clear error, or violative of due process. *See El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 784, 787, 858 P.2d 1263, 1266 (1993); 2 Am.Jur.2d *Administrative Law* § 522 (1994).

■ When reviewing administrative agency decisions courts will begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise. *Cf. El Vadito,*

115 N.M. at 792, 858 P.2d at 1271 (Ransom, C.J., dissenting).

When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation. *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n,* 106 N.M. 622, 625, 747 P.2d 917, 920 (1987). The court will confer a heightened degree of deference to legal questions that "implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987); *see also Stokes v. Morgan,* 101 N.M. 195, 202, 680 P.2d 335, 342 (1984) ("The special knowledge and experience of state agencies should be accorded deference."). However, the court is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law. *See Thomas v. Missouri Dep't of Social Servs.,* 805 S.W.2d 286, 288 (Mo.Ct.App.1991). The court should reverse if the agency's interpretation of a law is unreasonable or unlawful. *See Maestas v. New Mexico Pub. Serv. Comm'n,* 85 N.M. 571, 574, 514 P.2d 847, 850 (1973).

When the matter before the court is a question of fact, the court will generally defer to the decision of the agency, especially if the factual issues concern matters in which the agency has specialized expertise. *See Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 111 N.M. 636, 642, 808 P.2d 606, 612 (1991). The court will review the evidence in the light most favorable to the agency decision but it is not limited by the old standard of ignoring evidence unfavorable to the agency decision. Rather, the court can employ a whole record review to determine if the agency's factual determination is supported by substantial evidence. *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.,* 101 N.M. 291, 294, 681 P.2d 717, 720 (1984).

The determination of whether an administrative agency has jurisdiction over the parties or subject matter in a given case is a question of law. *El Vadito,* 115 N.M. at 787, 858 P.2d at 1266. As an administrative body created by statute, the agency's authority and jurisdiction are defined by statute. *New Mexico Elec. Serv. Co. v. New Mexico Pub. Serv. Comm'n,* 81 N.M. 683, 684–85, 472 P.2d 648, 649–50 (1970) [hereinafter *Electric v. Commission* ]. New Mexico courts will accord "little deference" to the agency's own interpretation of its jurisdiction. *El Vadito,* 115 N.M. at 787, 858 P.2d at 1266.

## III. STATUTE IN QUESTION

In seeking to restrain Farmington from invading its service territory, Morningstar has attempted to invoke the provision of the PUA that prevents certain kinds of public utilities from interfering with one anothers' service:

*Notwithstanding any other provision of the Public Utility Act ... if any public utility or mutual domestic water consumer association in constructing or extending its line, plant or system unreasonably interferes or is about to unreasonably interfere with the service or system of any other public utility or mutual domestic water consumer association rendering the same type of service, the commission, on complaint of the public utility or mutual domestic water consumer association claiming to be injuriously affected, may ... make such order and prescribe such terms and conditions ... so as to provide for the construction, development and extension, without unnecessary duplication and economic waste.*

Section 62–9–1 (emphasis added).

We note that ordinarily a municipality that operates a water system is authorized to furnish water outside its corporate boundaries under NMSA 1978, § 3–27–8 (Repl. Pamp.1995). This statutory power is limited if the municipality comes within the restrictions of the PUA. At that point Section 62–9–1 would restrict a municipality's extension of its water services beyond its boundaries.

The Commission argues that, under the statutory definitions in the PUA, neither Morningstar nor Farmington are a "public utility or mutual domestic water consumer association" and that, for this reason, the

Commission has no jurisdiction to hear Morningstar's complaint. Morningstar claims that, under the PUA, it is a "mutual domestic water consumer association" [hereinafter "mutual domestic"] and that Farmington is a public utility. Additionally Morningstar emphasizes the "notwithstanding" clause with which this segment of the statute begins. Morningstar argues that even if, for the purposes of the rest of the PUA, Farmington is not a public utility, this "notwithstanding" clause brings Farmington within the regulatory control of Section 62–9–1. The "notwithstanding" clause, according to Morningstar, allows it to seek protection under this statute from Farmington's intrusions.

We first discuss whether Farmington and Morningstar fall within the scope of the PUA. We shall then discuss whether the "notwithstanding" clause brings Farmington within the scope of the PUA and under the Commission's jurisdiction.

## IV. THE SCOPE OF THE PUBLIC UTILITY ACT

Since this case concerns water services we shall limit our discussion of the PUA as it applies to water providers. The policy behind the PUA is to regulate and supervise "public utilities" so that adequate services will be available at reasonable rates, and to encourage the development of utilities "without unnecessary duplication and economic waste." Section 62–3–1(B).

In common usage the expression "public utility" would connote any utility service provided to the public. Within the PUA, however, the expression "public utility" is a specialized term of art that by no means encompasses every type of water utility that provides service to the public. The meaning of "public utility" in the PUA is set forth by Section 62–3–3. In referring to water facilities, subsection (G) of this statute defines "public utility" or "utility" as "every *person* not engaged solely in interstate business ... that now does or hereafter may own, operate, lease or control ... any plant, property or facility for the supplying, storage, distribution or furnishing to or for the public of water for manufacturing, municipal, domestic or other uses." Section 62–3–3(G) (emphasis added). Subsection (E) of this statute defines "person" as "individuals, firms, partnerships, companies, rural electric cooperatives ..., corporations and lessees, [and] trustees or receivers appointed by any court." Section 62–3–3(E).

This broad meaning of "public utility" is greatly restricted by all the other interrelated statutory and regulatory provisions that delineate the scope of the PUA. There are many different kinds of water providers and water authorities in the New Mexico legal system. Some are affirmatively included in the PUA and fall within the jurisdiction of the Commission while others are explicitly excluded. Several types of water authorities are not mentioned at all in the context of the PUA; they are neither expressly included or excluded. The appendix following this opinion reflects our research of New Mexico law as it relates to different types of water providers. The PUA attempts to distinguish on the one hand utilities that are required to serve any and all members of the public who request water service and on the other hand utilities that operate more like a private coalition or club that chooses to limit its services only to its own select members. The PUA applies only to the former. The ambiguity of the Commission's jurisdiction is exposed when a private water coalition like Morningstar becomes quite large and begins to act more like a public utility by bidding on contracts and enlarging its geographical reach.

Among those expressly brought within the jurisdiction of the Commission, and relevant to this case, are municipal water providers that, by law, have elected to come within the terms of the PUA. As discussed in greater detail below, Section 62–3–3(E), includes municipalities that have "elected to come within the terms of the Public Utility Act." The process by which the municipality can come within the PUA is described by Section 62–6–5. Utilities that are within the jurisdiction of the PUA can apply to the Commission for a certificate of public convenience and necessity which gives the utility the right to begin construction or operation. Section 62–9–1. A utility or service territory that is regulated

by the PUA is often described as being "certificated." *See* §§ 62–3–2.1(C), 62–9–1.1(A). Additionally, as explained below, the Commission has jurisdiction to hold hearings when a large municipality that is not within the PUA interferes with the territory of a PUA-certificated utility. Section 62–9–1.1(A).

Also of relevance to this case is the fact that the PUA specifically protects mutual domestics. As discussed in greater detail below, mutual domestics were organized under the precursors to the Sanitary Projects Act, NMSA 1978, §§ 3–29–1 to –19 (Repl. Pamp.1995) [hereinafter SPA]. While mutual domestics are not actually regulated by the Commission, they are protected from encroachment under Section 62–9–1.

Of the utilities that are excluded from the PUA, municipalities that have not elected to submit themselves to the jurisdiction of the Commission are relevant to this case. These will be analyzed below.

The status of the above mentioned water providers is clear—they are either included in or excluded from the terms of the PUA. There are a number of providers that the PUA and the Commission's regulations do not explicitly include or exclude. The providers in this group that are pertinent to this case are water users' associations which are governed by NMSA 1978, §§ 73–5–1 to –9 (Orig.Pamp. & Cum.Supp.1995). As discussed below, we conclude that, with certain possible exceptions, any utility not expressly brought within the scope of the PUA is excluded from the Commission's jurisdiction. We must now establish which of these categories of water providers apply to Farmington and Morningstar.

## V. THE DISTINCTION BETWEEN MUTUAL DOMESTIC WATER CONSUMER ASSOCIATIONS, WATER USERS ASSOCIATIONS, AND MUNICIPAL WATER UTILITIES

Morningstar variously categorizes itself as a "mutual domestic water consumer associa-tion" and as a "water users' association." Despite the similar nomenclature, these are two distinct types of water providers that are governed by two different sets of laws.

### A. Mutual domestic water consumer associations

The statutory history of the term "mutual domestic water consumer association" demonstrates not only that the term has virtually disappeared from New Mexico law since 1965, but also that Morningstar's status as a "water users' association" is the product of a totally different statutory genealogy than the one to which mutual domestics belong. Mutual domestics can be traced to the precursors of the Sanitary Projects Act, Sections 3–29–1 to –19.

According to the current SPA, the definition of an SPA "association" "includes any association organized under Laws 1947, Chapter 206, Laws 1949, Chapter 79 or Laws 1951, Chapter 52, as well as any association organized under the provisions of the Sanitary Projects Act." Section 3–29–2(B). The 1947, 1949, and 1951 laws are the *direct lineal* ancestors of the SPA.

The 1947 laws appear to have first created the entity called a "Mutual Domestic Water Consumers' Association." The purpose of this act was to fund rural community water service projects.[1] This body of law was not called the "Sanitary Projects Act." The 1947 laws were repealed by the 1949 laws,[2] and the 1949 laws were repealed by the 1951 laws.[3] Mutual domestics continued to be the subject of regulation in each successive body of law. The 1951 laws were repealed in 1957,[4] and for the first time these enactments were called the "Sanitary Projects Act." The 1957 act expanded state funding beyond mutual domestics—which provided only water services—to include funding of sewer projects.

The 1957 SPA was amended in 1965.[5] This version of the act created the "sanitary

1. *See* 1947 N.M.Laws, ch. 206.

2. *See* 1949 N.M.Laws, ch. 79.

3. *See* 1951 N.M.Laws, ch. 52.

4. *See* 1957 N.M.Laws, ch. 122.

5. *See* 1965 N.M.Laws, ch. 300.

projects fund" to finance the provisions of the SPA. 1965 N.M.Laws, Ch. 300, § 14–28–10. At the same time, the law directed that the balance of the then existing mutual domestic water consumers association fund was to be transferred into the new SPA fund. *Id.* With the 1965 amendments, the term "Mutual Domestic Water Consumers' Association(s)" made its last appearance in the SPA. Though we know of no scholarly studies of this mesmerizing area of law, we believe that after the 1965 laws were enacted no new mutual domestics were formed. Nevertheless, the SPA as now codified and amended, is the governing statute for mutual domestics, should any still be in existence. *Cf.* N.M.Att'y Gen.Op. 62–99 (1962) (discussing the SPA as governing the conduct of a "Water Consumers Association").

■ Mutual domestics are at issue in this case because the term was, without explanation, included in the 1990 amendments to Section 62–9–1 of the PUA. *See* 1990 N.M.Laws, ch. 95. Only by showing that it is a mutual domestic, can Morningstar, under the PUA, claim protection from Farmington's intrusions. It is important to clarify that the PUA does not *regulate* any SPA association. *El Vadito*, 115 N.M. at 788, 858 P.2d at 1267. However, the PUA does expressly *protect* one type of SPA association—mutual domestics—from intrusion by a public utility. *See* 62–9–1.

Morningstar raises the legitimate point that, of all the types of utilities organized under the SPA, it is odd that only mutual domestics formed before 1965 should be singled out for protection in the PUA. Moreover, the term "mutual domestic water consumer association" is not defined anywhere in the current New Mexico statutes. It is arguable that the legislature intended the expression "mutual domestic water consumer association" to signify that *any* water provider formed under the SPA should be protected by Section 62–9–1. However, the language of the statute encourages no such interpretation. The statute explicitly protects only mutual domestics and we must presume that the legislature intended this limited scope. Nevertheless, because Morningstar is not a mutual domestic or any other kind of SPA provider, these questions are irrelevant to this case.

### B. Water users' associations

■ Article 5 of Chapter 73 is unofficially entitled "Water Users' Associations" and it is a completely separate body of law from the SPA. Morningstar's articles of incorporation, dated September 26, 1977, state that owners of land in San Juan county "have on this day formed a corporation under § 73–5–1 through § 73–5–9, N.M.S.A., 1978." Morningstar affirmed this fact in the companion case to this one, *Morningstar I*, 120 N.M. at 309, 901 P.2d at 727. No evidence or documentation supports Morningstar's assertions in this case that it is a mutual domestic governed by the SPA.

■ Chapter 73, Article 5 water users' associations are not expressly included nor excluded from the PUA. We cannot presume that these providers are outside the Commission's jurisdiction simply because they are not mentioned in the PUA statutes and regulations. Legislative silence by itself is not an expression of legislative intent. *See El Vadito*, 115 N.M. at 788, 858 P.2d at 1267 ("The PUA's silence as to whether the Commission has jurisdiction over SPA associations, by itself, proves to be inconclusive on the issue of whether the Commission has jurisdiction by necessary implication over SPA associations.").

[15] In interpreting this omission we must "look at the objectives the legislature sought to accomplish and thereby interpret the statute to achieve these purposes." *Garcia v. Thong*, 119 N.M. 704, 706, 895 P.2d 226, 228 (1995). While the inclusion of one group of water providers in the PUA does not automatically mean that all others are excluded, the legislature did offer insight into its intentions in this regard on at least one occasion. *See Wilson v. Rowan Drilling Co.*, 55 N.M. 81, 109, 227 P.2d 365, 383 (1950) ("The maxim 'expressio unius est exclusio alterius' is only an aid to construction and not a rule of law."). The legislature went through quite a bit of trouble to bring within the PUA a type of electric provider—rural electric cooperatives—that had been exempt-

ed from the PUA. These cooperatives are governed by the Rural Electric Cooperative Act, NMSA 1978, §§ 62–15–1 to –33 (Repl. Pamp.1993).

The legislature probably acted in response to our decision in *Socorro Electric Cooperative, Inc. v. Public Service Co.,* 66 N.M. 343, 345, 348 P.2d 88, 89 (1959). In that case an electric cooperative filed a petition with Commission to protest the intrusion by a certificated electric company into the cooperative's service territory. *Id.* This Court found that the PUA expressly exempted cooperatives from regulation by the Commission. *Id.* at 347, 348 P.2d at 90. Having no jurisdiction over the cooperative, the Commission could not grant it any affirmative relief. *Id.* at 349, 348 P.2d at 91–92.

After *Socorro* the legislature attempted, with 1961 N.M.Laws, Ch. 89, § 2, to bring rural electric cooperatives within the definition of "public utility" in the PUA. *See* NMSA 1953, § 68–3–2(F)(1) (Supp.1961); *Community Pub. Serv. Co. v. New Mexico Pub. Serv. Comm'n,* 76 N.M. 314, 317, 414 P.2d 675, 677 (1966), *cert. denied,* 385 U.S. 933, 87 S.Ct. 292, 17 L.Ed.2d 213 (1966). However, we found this attempt to be unconstitutional in *Community Public Service Co. v. New Mexico Public Service Commission.* In that case, we noted that cooperatives were not required to render service to the general public and that the Commission had no power to regulate their rates and financing; they were therefore not "public utilities." *Id.* at 317–18, 414 P.2d at 677–78. In contrast, other certificated electric utilities were required to render service to the public generally and their rates and financing were completely regulated. *Id.* at 316–17, 414 P.2d at 676. We concluded that cooperatives were at "a decided advantage" to other certificated utilities and the legislative attempt to include rural electric cooperatives into the PUA was unconstitutional. *Id.* at 318–19, 414 P.2d at 677–78.

Probably in response to this opinion the legislature went back to the drawing board and, in 1967 N.M.Laws, ch. 102, § 4, redrafted the Rural Electric Cooperative Act to say that should "any provision of the Rural Electric Co-operative Act . . . be held to be re-

pugnant to any provision of the Public Utility Act . . . the latter shall be controlling and the former shall be held repealed to the extent of the repugnancy." *See* NMSA 1953, § 45–4–32 (Supp.1967); NMSA 1978, § 62–15–32.

The fact that the legislature persisted in bringing within the PUA a previously excluded class of electric providers suggests the legislature intended to limit the definition of "public utility" to an enumerated list of specific types of utilities. *See El Vadito,* 115 N.M. at 788, 858 P.2d at 1267 (stating that SPA utilities are exempt from the PUA absent a provision that affirmatively brings them within the Commission's jurisdiction). The only exception to this rule seems to be when a utility belonging to a non-enumerated class begins to act like a public utility; that is, when it crosses the indistinct line between a private coalition serving its own select members and becomes a utility that opens its services to the public at large. *See Id.* at 789, 858 P.2d at 1268 ("An SPA association operating as a public utility would be subject to the Commission's exclusive regulatory jurisdiction, as any other public utility would be."). It may also be possible for a member of a non-enumerated class to elect to come within the PUA, though it is unlikely many utilities would volunteer for this bureaucratic burden. *Cf. Electric v. Commission,* 81 N.M. at 685, 472 P.2d at 650 (stating Commission had no authority over electric company that did not invoke Commission's jurisdiction).

We conclude that, absent a regulatory provision stating otherwise, or absent a willingness of the utility to serve "an indefinite public," any utilities not expressly brought within the scope of the PUA are excluded from the Commission's jurisdiction. *See El Vadito,* 115 N.M. at 790, 858 P.2d at 1269 (referring to "indefinite public"). In the case of water users' associations, this conclusion is supported by the fact that the Commission steadfastly insists that it has no jurisdiction over water users' associations. Additionally, Morningstar has offered no evidence to show that, as a water users' association, it is subject to the PUA.

Moreover, according to the statutes by which they are governed, water users' associ-

ations are intended to be a private coalition of "owners of lands, reservoirs or irrigation ditches" who organize an association "for their mutual advantage." *See* § 73–5–1. They are not intended or required to serve any and all members of the general public within a specific geographical area. In fact, as indicated above, there is no support in the record for Morningstar's claim that it has an actual "water supply service territory" as if it had some kind of property right—as does a PUA public utility—in a specific geographical region. Though water users' associations can "acquire lands and rights-of-way for their reservoirs, canals, ditches and works," the areas they serve seem to be defined largely by the property interests of their members. *See* §§ 73–5–9; *see also* § 73–5–1. Therefore Morningstar does not come within the Commission's regulatory jurisdiction.

#### C. Municipal water facilities

Municipalities may own and operate water facilities. These facilities are established and governed by NMSA 1978, §§ 3–23–1 to –10 (Repl.Pamp.1995), and by NMSA 1978, §§ 3–27–1 to –9 (Repl.Pamp.1995).

██ Under Section 62–3–3(E), with two exceptions, all municipal water facilities are excluded from the PUA. Under the first exception, a municipality can choose to submit itself to full regulation by the PUA under Section 62–6–5, which states that

> any municipality desiring to avail itself of all the benefits of the Public Utility Act [Articles 1 to 6 and 8 to 13 of Chapter 62 NMSA 1978] and of the regulatory services of the commission may elect to come within the provisions of that act and to have the utilities owned and operated by it, either directly or through a municipally owned corporation, regulated and supervised under the provisions of that act. When a municipality so elects, in the manner provided in this section, it shall be subject to all the provisions of the Public Utility Act.

Section 62–6–5 (flush language). Farmington has not chosen to become subject to the PUA.

The second exception applies to municipalities with a population of more than two hundred thousand. Section 62–9–1.1(C). If such a municipality has not elected to submit to PUA regulation, and if it intrudes "into a geographical area described in a certificate of public convenience and necessity granted by the commission to a public utility rendering the same type of service," the commission has the jurisdiction to hold a hearing on the matter and, if necessary, order the municipality to cease and desist its planned intrusion. Section 62–9–1.1(A). This exception seeks only to limit the unbridled expansion of a large municipality's water system; the municipality itself does not come under the complete PUA regulatory scheme. Since Morningstar is not a PUA-regulated utility, and Farmington's population is less than two hundred thousand, this exception in inapplicable to this case. Despite the fact that it provides water services to the public, under the PUA Farmington is not a "public utility." The Commission has no jurisdiction over Farmington.

It is thus apparent that neither Morningstar nor Farmington are "public utilities" for the purposes of the PUA. The Commission would have jurisdiction over this dispute if two of Morningstar's claims were correct: (1) that Morningstar is a mutual domestic, and (2) that Farmington is a public utility under the PUA. If either claim fails, then Morningstar cannot seek protection from Farmington's intrusion into its territory under Section 62–9–1. Since Morningstar is not a mutual domestic, and no provision or exception brings Morningstar within the PUA, there is no way for the Commission to exercise jurisdiction over this dispute. We therefore will only briefly discuss whether the "notwithstanding" clause of Section 62–9–1, has any effect on Farmington's status under the PUA.

#### VI. THE "NOTWITHSTANDING" CLAUSE

The PUA definitional statute, Section 62–3–3(E), could not be more explicit: "[N]o such municipality shall *for any purpose* be considered a public utility." (Emphasis added.) The exclusion of municipalities is reem-

phasized by other statutes in the PUA. *See, e.g.,* Section 62–6–4(A) ("Nothing in this section . . . shall be deemed to confer upon the *commission power or jurisdiction to regulate* or supervise the rates or service of any utility owned and operated by any municipal corporation.").

■■■ The definitional statute sets the basic parameters for everything else in the PUA. Once something is defined out of a statute it cannot, without an unambiguous and specific provision, be brought back in. We cannot assume that the inexplicit "notwithstanding" clause of Section 62–9–1, makes the PUA applicable to non-certificated municipalities. However, as discussed above, there are two unambiguous provisions that do, under specific circumstances, bring municipalities back into the PUA: municipalities that elect to avail themselves of the benefits of the PUA, Section 62–6–5, and large non-certificated municipalities that intrude upon the territory of certificated public utilities, Section 62–9–1.1(A). These two exceptions show that when the legislature intended the PUA to apply to municipalities it did so explicitly. The indefinite "notwithstanding" clause was not meant to add to these two exceptions.

A clue to the purpose of the "notwithstanding" clause of Section 62–9–1 can be found in earlier versions of the same statute. The word "notwithstanding" did not appear in Section 62–9–1 until 1967.[6] Prior to the 1967 amendment, the corresponding clause began with the words "but, if":

> No public utility shall hereafter begin the construction or operation of any public utility plant or system or of any extension thereof, without first obtaining from the commission a certificate that public convenience and necessity require or will require such construction or operation; *provided that this section shall not be construed to require any such public utility to secure a certificate for an extension within any municipality or district within which it has heretofore lawfully commenced operations, or for an extension within or to territory already served by it, necessary in*

the ordinary course of its business, or for an extension into territory contiguous to that already occupied by it and not receiving similar service from another utility; *but, if* any public utility in constructing or extending its line, plant or system unreasonably interferes or is about unreasonably to interfere with the service or system of any other public utility, the commission on complaint of the public utility claiming to be injuriously affected, may, after hearing, on reasonable notice, make such order and prescribe such terms and conditions in harmony with this act as are just and reasonable.

1965 N.M.Laws, ch. 289, § 10 (emphasis added). The statute—as it relates to this case—might be summarized as follows: A public utility must obtain a certificate of public convenience and necessity in order to construct an extension; such a certificate will not be required if the utility is extending within an area it already serves or a contiguous area not receiving service; *but, if,* in making such an extension, the public utility invades the territory of another certificated utility, remedies are available to the invaded utility. The "but, if" clause refers to the language immediately preceding the clause. It indicates that the law generally permits a public utility to extend its services as required by the ordinary course of business, "but" another public utility will be protected from being invaded by such an extension. The current "notwithstanding" clause is an expansion of this idea: despite the fact that other parts of the PUA may permit a utility to build an extension, *if such an extension interferes* with another certificated utility, remedies are available to the invaded utility. *See* Section 62–9–1.

■■■ Generally, a "notwithstanding" clause serves to prevent the matters following the clause from being frustrated by other statutory provisions. The purpose of the "notwithstanding" clause in this case is far from clear. In light of the foregoing discussion, it is sufficient to state that, whatever purpose the clause serves, it does not bring Farmington within the scope of the PUA.

---

6. *See* 1967 N.M.Laws, ch. 96, § 1.

## VII. EQUAL PROTECTION

■ The purpose of the PUA is to not only regulate, but to protect the interests of the utilities that come under its jurisdiction. Only utilities that fall within the Commission's regulatory jurisdiction can obtain territorial protection under Section 62–9–1 or Section 62–9–1.1. Under these statutes, a utility that possesses a certificate of public convenience and necessity can be protected from intrusion by another certificated utility, Section 62–9–1, or by a non-certificated municipality with a population exceeding two hundred thousand, Section 62–9–1.1. However, the Commission's jurisdiction is limited. For example, it seems from the plain language of these statutes that the Commission lacks jurisdiction over an intrusion by an unregulated municipality with a population of less than two hundred thousand.

■ The gist of Morningstar's argument is that Section 62–9–1 protects a mutual domestic from invasion by a PUA-regulated utility, but not from an unregulated municipality like Farmington. *See* U.S. Const. amend. XIV, § 1; N.M. Const. art. II, § 18. Morningstar argues that these statutes discriminate unconstitutionally against the invaded utility solely on the basis of the status of the invader.

■ Morningstar is correct in pointing out that the appropriate standard of review for this constitutional challenge is minimal scrutiny and that Morningstar bears the burden of proving that the statute "lacks a reasonable relationship to a legitimate governmental purpose." *Marrujo v. New Mexico State Highway Transp. Dep't,* 118 N.M. 753, 758, 887 P.2d 747, 752 (1994). Morningstar claims that when the territory of a PUA utility is being invaded, the harm is the same whether the invader is regulated by the PUA or not. This, according to Morningstar, is not a reasonable distinction and it has no rational relationship to the purpose of the statute.

Unfortunately, Morningstar's equal protection argument is founded upon the presumption that Morningstar in some way comes under the jurisdiction of the Commission. Morningstar characterizes itself in these arguments as a "mutual domestic" and a "non-certificated mutual domestic." We have already established that Morningstar is not a mutual domestic and is not brought within the scope of the PUA by any regulation or law. This case concerns a situation over which the Commission has no jurisdiction: the invasion by one non-certificated utility into the territory of another non-certificated utility.

Moreover, Morningstar is incorrect in saying the distinction in question lacks a rational basis. In *Dickinson v. Maine Public Service Co.* the Supreme Court of Maine persuasively explained the rationale behind the fact that a regulated utility is given preference over an unregulated utility, even to the detriment and ultimate abolition of the latter.

> The whole body of public utility law has been developed here and elsewhere upon the concept of regulated monopoly. Implicit in this concept is an acceptance of the principle that a public utility offers its facilities and services to the public without discrimination and that it is obligated to extend its services as needed within its service area unless the supervisory agency determines that it is not practicable or economically feasible to do so. A public utility yields to the sovereign with respect to approval of rates, methods of financing and other matters of policy which are ordinarily within the sole province of management in private business. In return for relinquishing the right to determine without let or hindrance whom it will serve, what it will charge, or how it will finance or invest, it is usually given relative freedom from competition in its service area on the part of public utilities similarly regulated and controlled. The monopoly thus afforded as among competing public utilities is in effect a quid pro quo for the obligation to render public service and to submit to regulation and control. Monopoly granted and assured by the sovereign could not otherwise be justified within the framework of the constitution.

*Dickinson v. Maine Pub. Serv. Co.,* 223 A.2d 435, 438 (Me.1966).

Regulation also serves the New Mexico statutory purpose of preventing "unneces-

sary duplication and economic waste." Section 62–9–1. "Certification regulates competition within the industry, thereby preventing overinvestment in high fixed costs and encouraging the achievement of economies of scale." *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n,* 112 N.M. 379, 387, 815 P.2d 1169, 1177 (1991). Furthermore, regulation protects the utility's consumers. Because it is a monopoly the utility must be regulated so that it cannot take advantage of its position or its customers. In exchange for submitting to oversight by the Commission, the utility is permitted to operate as a monopoly within its service area.

Morningstar's constitutional claims are without merit.

## VIII. CONCLUSION

In its response to Morningstar's complaint before the Commission, the staff of the Commission expressed some sympathy for "the quandary facing Morningstar." We affirm, however, the Commission's conclusion that it had no jurisdiction over the dispute between Morningstar and Farmington, and that this lack of jurisdiction does not violate Morningstar's equal protection rights.

IT IS SO ORDERED.

BACA, C.J., and MINZNER, J., concur.

## APPENDIX

I. Water providers affirmatively included in the PUA:

*Municipalities that have "elected to come within the terms of the Public Utility Act."* Section 62–3–3(E). The process by which the municipality can come within the PUA is described by Section 62–6–5. The Commission also has jurisdiction to hold hearings when a large municipality that is not within the PUA interferes with the territory of a PUA-certificated utility. Section 62–9–1.1(A).

*Mutual domestic water consumer associations.* These were organized under the precursors to the SPA, Sections 3–29–1 to –19. These are protected by, but not regulated by, the PUA under Section 62–9–1.

*H class counties.* These are included within the PUA's definition of "municipality." Section 62–3–3(D). Municipalities can elect "to come within the terms of the Public Utility Act." Section 62–3–3(E). An H class county is "[a]ny county which covers an area of not more than 200 square miles." NMSA 1978, § 4–44–3 (Repl.Pamp.1992). The process by which such a county can come within the PUA is described by Section 62–6–5.

*Water and sanitation districts.* These are organized under NMSA 1978, §§ 73–21–1 to –55 (Repl.Pamp.1987 & Cum.Supp.1993). They can elect "to become subject to the jurisdiction of the New Mexico public utility commission." Section 73–21–55(B). They can also be compelled, upon a protest by taxpayer-electors, to file rates, tolls, or charges with the Commission. Section 73–21–55(C).

II. Water providers expressly excluded from the PUA:

*Municipalities that have not "elected to come within the terms of the Public Utility Act."* Section 62–3–3(E).

*Water utilities owned by class B counties.* Section 62–6–4(A) excludes from the PUA a water utility "owned and operated by … a class B county." Among the factors that define a class B county is "a population of more than ninety-eight thousand but less than one hundred thousand." NMSA 1978, § 4–36–8(A) (Cum.Supp.1995).

*Water for exclusively personal use.* Section 62–3–3(G) refers to Section 62–3–4(A), which excludes from the PUA any person who furnishes water service "only to himself."

*Railroad-owned water facilities that are merely incidental to the railroad business.* Section 62–3–3(G) refers to Section 62–3–4(B), which excludes water services owned by railroads that are only incidental to its railroad business. These are also expressly excluded by the "Water Utilities" regulations promulgated by the PUA in 2 NMPUC Rule 710.4(u)(3) (Jan. 1, 1989) (definitions).

*Utilities that are for lease or sale.* Section 62–3–3(G) refers to Section 62–3–4.1(A), which excludes a Section 62–3–3(G) utility "which is leased or held for lease or sale," or which is "vested by lease or other contract." Moreover, if such a lease or contract has been terminated or breached, the utility will

not come under the PUA for up to ninety days.

*Article 11, Section 7 utilities.* Section 62–3–3(G) refers to Section 62–3–4 which excludes utilities covered by Article 11, Section 7 of the New Mexico Constitution which discusses the powers of the corporation commission over "railway, express, telegraph, telephone, sleeping car and other transportation and transmission companies and common carriers within the state."

*Irrigation systems.* These are excluded from the PUA by Section 62–3–3(G)(3), and by the "Water Utilities" regulations promulgated by 2 NMPUC Rule 710.4(u)(1) (Jan. 1, 1989). Though it is not specified in the PUA or the regulations, this exclusion probably includes *irrigation districts* governed by NMSA 1978, §§ 73–9–1 to –13–47 (Orig.Pamp. & Cum.Supp.1995).

*Cooperative associations.* The "Water Utilities" regulations promulgated by 2 NMPUC Rule 710.4(u)(4) (Jan. 1, 1989), exclude cooperative associations organized under NMSA 1978, §§ 53–4–1 to –45 (Repl. Pamp.1983 & Cum.Supp.1995).

*Ditch and acequia districts.* The "Water Utilities" regulations promulgated by 2 NMPUC Rule 710.4(u)(5) (Jan. 1, 1989), exclude from the PUA ditch and acequia districts governed under NMSA 1978, §§ 73–2–1 to –68 (Orig.Pamp. & Cum.Supp.1995).

We have also, in the opinions of this Court, excluded from the definition of "public utility" parties that choose to serve select individuals and "cannot legally be required to serve the public generally." *Socorro Elec. Coop., Inc. v. Public Serv. Co.*, 66 N.M. 343, 348, 348 P.2d 88, 91 (1959) (quoting *San Miguel Power Ass'n v. Pub. Serv. Comm'n*, 4 Utah 2d 252, 292 P.2d 511, 512 (1956)); *see also El Vadito*, 115 N.M. at 790–91, 858 P.2d at 1269–70. Also excluded are the water providers mentioned above that have the power to elect to come within the terms of the PUA, but choose not to do so.

III.  Water providers neither affirmatively included nor expressly excluded from the PUA:

The language of these statutes is broad enough to encompass almost any purpose for which public or private users would require water services.

*Water users' associations.* These are governed by Sections 73–5–1 to –9.

*Intercommunity water or natural gas supply associations.* These are formed by two or more municipalities and are governed by NMSA 1978, §§ 3–28–1 to –22 (Repl. Pamp.1995).

*Artesian conservancy districts.* These are governed by NMSA 1978, §§ 73–1–1 to –27 (Orig.Pamp. & Cum.Supp.1995).

*Conservancy districts.* These are governed by NMSA 1978, §§ 73–14–1 to –19–5 (Orig.Pamp. & Cum.Supp.1995). *Cf. City of Raton v. Vermejo Conservancy Dist.*, 101 N.M. 95, 99–100, 678 P.2d 1170, 1174–75 (1984) (discussing the laws applying to conservancy districts as being distinct from laws governing other types of water use).

*Sanitary Projects Act associations* with the apparent exception of the protection of mutual domestics. SPA associations are governed by Sections 3–29–1 to –19. "[T]he legislature intended SPA associations to be free from the Commission's extensive regulatory oversight." *El Vadito*, 115 N.M. at 788, 858 P.2d at 1267.