**SUR CONTRA LA CONTAMINACIÓN, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

and

**AES Puerto Rico L.P., Intervenor.**

No. 99–1855.

United States Court of Appeals, First Circuit.

Heard Jan. 7, 2000.

Decided Feb. 4, 2000.

---

Pedro J. Varela for petitioner.

Michele L. Walter, with whom Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, Alice L. Mattice, Attorney, Environmental Defense Section, U.S. Department of Justice, M. Lea Anderson, Attorney, Office of General Counsel, U.S. Environmental Protection Agency, and Joseph A. Siegel, Office of Regional Counsel, U.S. Environmental Protection Agency, Region II, were on brief, for respondent.

Deborah E. Jennings, with whom Monica D. Gibson and Piper Marbury Rudnick & Wolfe LLP were on brief, for intervenor.

Before LYNCH, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

LYNCH, Circuit Judge.

Sur Contra la Contaminación (SURC-Co), a community organization made up of residents of Guayama, Puerto Rico, challenges a Prevention of Significant Deterioration (PSD) permit, issued by the Environmental Protection Agency, that authorizes construction of a power plant in the ward of Jobos within that municipality. The group contends that the Agency's decision to grant the permit was arbitrary and capricious and in violation of the Executive Order on Environmental Justice. *See* Federal Actions To Address Environmental Justice in Minority Populations and Low–Income Populations, Exec. Order No. 12,898, 59 Fed.Reg. 7629 (1994). The Environmental Appeals Board carefully considered the challenge and denied it. *See In re AES Puerto Rico, L.P.,* 29 Envtl. L. Rep. (Envtl.L.Inst.) 41,132 (Envtl.App.Bd. May 27, 1999). For the following reasons, we, too, reject the challenge.

## I.

On January 10, 1996, Region II of the EPA received a PSD permit application from AES Puerto Rico L.P. for a 454–megawatt coal-fired, steam-electric cogeneration power plant it wished to build in Guayama.[1] The permit was required under the Clean Air Act because the plant would be a major new stationary source of certain pollutants, including sulfur dioxide and fine particulate matter. *See* 42 U.S.C. §§ 7475, 7479; 40 C.F.R. § 52.21(b)(1)(i)(a). PSD permits are designed to insure that covered pollutants emitted by new or modified sources do not exceed the allowable increments of additional air pollutants (the increments) or lead to the exceeding of the National Ambient Air Quality Standards (the Standards) in areas that have been designated "attainment" or "unclassifiable."[2] *See* 42 U.S.C. §§ 7471, 7473. The PSD program represents a balancing of "economic growth" with the "preservation of existing clean air resources." *Id.* § 7470(3).

Before the EPA grants a PSD permit, the owner or operator of the proposed facility must satisfy certain prerequisites, two of which are of importance here. First, a permit will be issued only if the owner "demonstrates ... that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess" of the increments or the Standards. 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k). This is accomplished through air quality modeling and ambient air monitoring, *see* 40 C.F.R. § 52.21(*l*), (m), though the extensiveness

of these two inquiries can vary. According to the EPA's draft New Source Review Workshop Manual,[3] "a full impact analysis," including "multi-source modeling," i.e., air quality modeling that takes into account the proposed source, existing sources, and residential, commercial, and industrial growth that accompanies the new source, for a particular pollutant is not required "when emissions of that pollutant from a proposed source ... would not increase ambient concentrations by more than prescribed significant ambient levels." Further, the EPA may waive the air monitoring requirement if "[t]he emissions increase of the pollutant from the new source ... would cause, in any area, air quality impacts less than" certain de minimis monitoring levels. 40 C.F.R. § 52.21(i)(8)(i).

Here, AES used EPA-approved air quality modeling techniques to predict emissions of both sulfur dioxide and fine particulate matter from the proposed plant. The predicted sulfur dioxide emissions were all below the thresholds, though the one for the twenty-four hour averaging time came very close to the significant impact level (.03 micrograms per cubic meter below the threshold). As a result, the Region did not require AES to conduct a full impact analysis and exempted AES from conducting preconstruction ambient air monitoring for sulfur dioxide. The predicted fine particulate matter emissions, however, were above the designated significant impact levels and de minimis monitoring levels, so the EPA required AES to conduct a full impact analysis and ambient

1. The PSD permit program constitutes part of a state's State Implementation Plan (SIP), which is the program designed to attain and maintain the National Ambient Air Quality Standards within each state. Since the EPA has found that Puerto Rico's SIP does not meet the Clean Air Act's PSD requirements, the federal PSD plan has been incorporated into Puerto Rico's SIP. *See* 40 C.F.R. § 52.2729 (finding that Puerto Rico's SIP "does not include approvable procedures for preventing the significant deterioration of air quality" and incorporating the federal plan);

*see also* 40 C.F.R. 52.21(b)-(w) (federal PSD plan).

2. Guayama has been designated by the EPA as an "attainment" area for sulfur dioxide and an "unclassifiable" area for fine particulate matter. *See* 40 C.F.R. § 81.355.

3. The Manual, while not binding on the agency, represents the EPA's views on technical issues; accordingly, the Regions give it weight in their decisions.

air monitoring of that pollutant. Both of these analyses were conducted and both indicated that the proposed plant would not cause or contribute to a violation of the Standards or the PSD increments.

Second, a permit will not be issued unless the "proposed facility is subject to the best available control technology [ (BACT) ] for each pollutant subject to regulation." 42 U.S.C. § 7475(a)(4). BACT "means an emissions limitation ... based on the maximum degree of reduction for each pollutant subject to regulation under [the] Act which would be emitted from any proposed major stationary source ... which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source ... through application of production processes or available methods, systems, and techniques...." 40 C.F.R. § 52.21(b)(12).

AES proposed a novel combination of three proven control technologies: circulating fluidized bed boilers with limestone injection; low sulfur coal; and a dry scrubber. The company claims that this combination will lead to "one of the world's cleanest coal-fired power plants." Though this combination has not been used before, the EPA believes that this control technique is "technically feasible" and "will result in a real decrease in impacts." It, therefore, accepted the combined technologies as the BACT.

On April 4, 1997, the Region published a notice that announced its intention to issue the PSD permit to AES. As required, the Region conducted public hearings and received written submissions, which it reviewed. *See* 42 U.S.C. §§ 7470(5), 7475(a)(2). In response to the community's concerns, the EPA conditioned the permit on AES's conducting post-permit multi-source modeling and ambient air monitoring of sulfur dioxide, even though these tests were not required by the Act or the regulations.[4] Also, the EPA prepared an environmental justice analysis. *See* Exec. Order No. 12,898, 59 Fed.Reg. 7629 (1994). On September 18, 1998, the Region issued the PSD permit. A number of individuals and groups, including SURCCo, challenged the petition before the Environmental Appeals Board. The Board, on May 27, 1999, denied these petitions for review.[5] *See In re AES*, 29 Envtl. L. Rep. at 41,132. SURCCo now brings this petition.

## II.

■ We have jurisdiction to review this petition. *See* 42 U.S.C. § 7607(b)(1); 40 C.F.R. § 124.19(f)(1). Our review of the permit is governed by the Administrative Procedure Act's "arbitrary and capricious" standard. *See* 5 U.S.C. § 706(2)(A); *Pan Am. Grain Mfg. Co. v. U.S. EPA*, 95 F.3d 101, 105 (1st Cir.1996) (reviewing state implementation plan); *Adams v. U.S. EPA*, 38 F.3d 43, 49 (1st Cir.1994) (reviewing NPDES permit); *Citizens for Clean*

4. Two days before oral argument, the EPA notified the court and the other parties of the results of two post-permit modeling analyses conducted by AES. The first analysis was based on maximum permitted emission limits of all sources in the area and the second was based on actual emissions from those sources during a two-year period. The first analysis indicated that, if the sources operated at maximum permitted sulfur content, there would be a violation of the Standards. The second analysis indicated no violations of the Standards. The EPA says that it will work with the Puerto Rico Environmental Quality Board to revise the Commonwealth's State Implementation Plan in order to lower the allow-

able emissions limits of existing sources. If the Board fails to cooperate in the Plan's revision, the EPA has the authority to require it to do so. *See* 42 U.S.C. § 7410(k)(5). The analyses have no effect on the permit decision at issue here since the modeled sulfur dioxide emissions from the proposed plant are not significant. *See* 40 C.F.R. § 51.165(b)(2).

5. "Denial of the petition for review" is the term of art under the regulations, but the term is a bit misleading. In fact, the Environmental Appeals Board does consider the arguments made and, in that sense, does review the Region's action.

*Air v. U.S. EPA,* 959 F.2d 839, 845 (9th Cir.1992) (reviewing PSD permit).

SURCCo's petition focuses on purported technical errors in the air quality analyses of sulfur dioxide and fine particulate matter and on assertions that the EPA should have applied its discretion differently. SURCCo does not directly challenge the PSD permit regulations or Guayama's attainment designation. The EPA, assisted by AES, defends the permit.

### A. *Sulfur Dioxide*

■ SURCCo first alleges that the EPA should have required AES to conduct a full impact analysis of sulfur dioxide emissions. AES's modeled impact analysis for the 24–hour averaging time for sulfur dioxide emissions (4.97 micrograms per cubic meter) was minutely below the significant impact level (5.00 micrograms per cubic meter). SURCCo contends that the EPA should have ordered a full impact analysis before granting the final permit because: a) the EPA accepted "a combination of controls which have never been used before," and b) to achieve the emissions limit, AES must achieve a 99% efficiency rate. That is, because the efficiency of this combination of technologies is untested, the EPA should have ordered a full impact study despite the fact that the modeled impact was below the significant impact level that would automatically trigger further testing. Further, SURCCo says that evidence it submitted—which the EPA rejected—contradicted AES's impact analysis. The EPA says, in response, that "the permit requires AES to limit the facility's emission rate to extremely low levels through an innovative combination of state-of-the-art control technologies." EPA also says that AES used appropriate models while "the modeling on which SURCCo relies applied the models simplistically and made unrealistic assumptions."

■ SURCCo has provided no evidence of arbitrariness or capriciousness in the EPA's determination that AES's proposed controls will achieve BACT, even though the combination of controls is novel. Each of these three components has been tested and used; only their combination is new. It was rational for the Agency to prefer its own model, to reject SURCCo's proposed alternative modeling that allegedly showed sulfur dioxide emissions above the threshold levels, and to accept, instead, AES's modeling. As other courts have held, the Agency's choice of a model will be sustained if it bears a "rational relationship to the characteristics of the data to which it is applied." *Appalachian Power Co. v. EPA,* 135 F.3d 791, 802 (D.C.Cir.1998) (computer models); *see also Pan Am. Grain,* 95 F.3d at 105. The Agency was, thus, within its discretion, under the regulations, to exempt AES from conducting a full impact analysis.

■ SURCCo next alleges that the EPA erred in including in its permit a condition that a full impact analysis be conducted after the issuance of the permit. This is, in a sense, an odd argument for SURCCo to make, but it is made in furtherance of the plea that a full impact analysis be required before, not after, the permit issues. A post-permit analysis will not do, SURCCo says, because this denies SURCCo the right to comment on data collected in that analysis. Without accepting the premise that a community group has no mechanism at all to comment, we note that there is no legal requirement that there be public comment for a post-permit analysis. Indeed, the regulations allow the EPA to require post-operation monitoring. *See* 40 C.F.R. § 52.21(m)(2). Further, the analysis must be conducted in accordance with EPA models and protocols, *see* 40 C.F.R. § 52.21(*l*)(1), which have been subject to nationwide public review.[6]

---

**6.** SURCCo's claim that the Agency acted arbitrarily when it deleted the clause "impacting AES–PRCP's Significant Impact Area" from

the permit also fails because, as the EPA notes, that language was unnecessary since

■ SURRCo next contends that the EPA relied on outdated—and perhaps incorrect—air quality data to evaluate current air quality conditions in Guayama. It claims that AES should have relied on more recent data collected by the Puerto Rico Environmental Quality Board in 1990. Further, before the EPA issued this permit, it should have conducted ambient air quality analysis (or, alternatively, should have relied on more recent data) in .order to determine if Guayama is, in fact, in attainment. Failure to have done so, SURCCO claims, was error. The EPA replies that it had no "reason to question the continuing validity of its conclusion that total sulfur dioxide emissions from all sources in the area were well below the [Standards], because no major new sources had been constructed in the area since" 1983, when the EPA last determined that the air quality in the area was below the Standards. The EPA also states that the Environmental Quality Board's data would have been rejected if it had been presented. Finally, the EPA says that ambient air monitoring is required once the facility is in operation. In this case, there is no legal requirement that ambient air monitoring should have been done prior to the issuance of the permit, nor is there evidence that casts doubt on the EPA's conclusion that current air quality is within the Standards.

### B. *Fine Particulate Matter*

■ SURCCo contends that AES's fine particulate matter analysis was flawed because AES used old and unrepresentative data and failed to use more recent data that was available to it before it issued the permit. They contend that if the more recent data were used the analysis would show that the fine particulate matter standard would be exceeded. The EPA, in response, contends that AES complied with all of the modeling and monitoring requirements and used the most recent data available to it prior to its permit

the EPA determined that the plant would have

application. The regulations do not require AES to consider post-application data. *See* 40 C.F.R. § 52.21(m)(1)(iv) (background monitoring data must "represent at least the year preceding receipt of the [permit] application"). While some different fact patterns (e.g., a great delay) might give SURCCo's argument more weight, the facts here do not. The EPA and AES present rational evidence that the more recent data, on which SURCCo relies, are unrepresentative and when corrected actually confirm AES's analysis that the standards will not be exceeded. The EPA also properly explained why it modified the permit to include a revised BACT limit for fine particulate matter. Finally, the EPA also acted reasonably when it asked AES (after the public comment period) to submit additional information to take account of this revised limit. *See* 40 C.F.R. § 124.17(b).

### III.

■ SURCCo asks us, as well, to revoke the permit because of alleged violations of the President's Executive Order on Environmental Justice. *See* Exec. Order No. 12,898, 59 Fed.Reg. 7629 (1994). The Order requires that, "[t]o the greatest extent practicable and permitted by law, . . . each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." *Id.* § 1–101, 59 Fed. Reg. at 7629.

The Order, however, was "intended only to improve the internal management of the executive branch"; by its own words, the order "shall not be construed to create any right to judicial review." *Id.* § 6–609, 59 Fed.Reg. at 7632–33. We therefore cannot review the permit on this basis. *See Morongo Band of Mission Indians v.*

no "significant impact."

*FAA,* 161 F.3d 569, 575 (9th Cir.1998); *see also Air Trans. Ass'n of Am. v. FAA,* 169 F.3d 1, 8–9 (D.C.Cir.1999).

We have considered SURCCo's other arguments, as well, and conclude that they are without merit.

### IV.

While the residents of Guayama may, indeed, have valid concerns about the air quality in their municipality, and in particular in Jobos, SURCCo's petition presents no basis to conclude that Region II's grant of a PSD permit to AES was arbitrary or capricious. As this court said in *Pan American Grain Manufacturing Co.,* "[i]n each instance the EPA presented reasoned explanations ... notwithstanding petitioner's objections. Moreover, petitioner's criticisms ... involve areas in which EPA's expertise is heavily implicated, and we may not substitute our judgment for that of the Administrator." *Pan Am. Grain,* 95 F.3d at 105 (internal quotation marks and citations omitted). SURCCo's concerns, insofar as they relate to Guayama's attainment designation, Puerto Rico's State Implementation Plan, emissions from other facilities in the area, or other matters, do not affect the validity of the permit and should be presented in other fora. SURCCo's involvement was nonetheless of value to its objectives. That the permit issued here is particularly stringent may be due in large part to the participation of the area residents.

*Petition denied.*