The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **December 4, 2023**

**No. A-1-CA-39522**

**WILDEARTH GUARDIANS,**

　　　Petitioner-Appellant,

v.

**NEW MEXICO ENVIRONMENTAL IMPROVEMENT BOARD,**

　　　Respondent-Appellee,

and

**NEW MEXICO ENVIRONMENT DEPARTMENT; XTO ENERGY INC.; and 3 BEAR DELAWARE OPERATING -- NM, LLC; SPUR ENERGY PARTNERS LLC,**

　　　Intervenors-Appellees.

**APPEAL FROM THE ENVIRONMENTAL IMPROVEMENT BOARD**
**Phoebe Suina, Board Chair**

Daniel L. Timmons
Samantha Ruscavage-Barz
Tim Davis
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Karla J. Soloria, Assistant Attorney General
Emily Bowen, Assistant Attorney General
Santa Fe, NM

for Respondent-Appellee

Lara Katz, Special Assistant Attorney General
Chris Vigil, Assistant General Counsel
Santa Fe, NM

for Appellee New Mexico Environment Department

Montgomery & Andrews, PA
Louis W. Rose
Kari E. Olson
Santa Fe, NM

for Appellee XTO Energy Inc.

Beatty & Wozniak, P.C.
James Martin
Santa Fe, NM
Jobediah Rittenhouse
Chris Colclasure
Denver, CO

for Appellee 3 Bear Delaware Operating -- NM, LLC

Holland & Hart LLP
Adam G. Rankin
Santa Fe, NM
Jill H. Van Noord
Boulder, CO
Tina R. Van Bockem
Denver, CO

for Appellee Spur Energy Partners LLC

**OPINION**

**BUSTAMANTE, Judge, retired, sitting by designation.**

{1}     We are presented with a technically and legally complex direct appeal challenging the New Mexico Environmental Improvement Board's (the Board) decision to affirm the New Mexico Environment Department's (the Department) grant of an air quality permit and three 20.2.72.220 NMAC general construction permit registrations. WildEarth Guardians (WildEarth) argues that (1) 20.2.72.208(D) NMAC's requirement that a facility's emissions not "cause or contribute to" a violation of National Ambient Air Quality Standards (NAAQS) does not allow use of a de minimis standard—commonly called a significant impact level (SIL); (2) the air quality permit and registrations at issue were improperly granted because evidence demonstrates they will cause or contribute to a violation of the NAAQS; and (3) the registrations at issue were improperly granted because they are located in nonattainment areas, pursuant to 20.2.79.7(AA) NMAC (6/3/2011). We conclude the use of a SIL is allowable when determining whether a facility causes or contributes to an increase of the NAAQS, pursuant to 20.2.72.208(D) NMAC, the evidence demonstrates the permit and the registration's emissions do not cause or contribute to an increase of the NAAQS, and the general construction permit registrations are not located in a nonattainment zone. We affirm the grant of the permits, but remand for redaction of paragraphs 102-105 of the Board's final order.

**BACKGROUND**

{2}    This appeal involves ozone emissions. Ozone causes irritation and inflammation in the respiratory system and tissue damage to vegetation. Ozone is beneficial in the stratosphere because it blocks harmful light radiation, but is harmful when it is present in the lower troposphere, where we live and breathe. Ozone is a secondary pollutant, meaning ozone is not emitted on its own, but rather is formed by the chemical reaction between nitrogen oxide (NOx) emissions and volatile organic compounds (VOCs) in sunlight. This makes it difficult and expensive to calculate ozone quantities and to parse out the source of the NOx and VOCs contributing to them.

{3}    The Clean Air Act's primary tool to combat pollution relies on National Ambient Air Quality Standards (as previously noted, NAAQS). 42 U.S.C. § 7408(a); 42 U.S.C. § 7409(a)(1). NAAQS establish standards for six criteria pollutants, including ozone, which must be met by all the states. 40 C.F.R. pt. 50 (2023). The Clean Air Act is implemented through so-called cooperative federalism—meaning the Federal government sets national standards intended to protect the air, while the states implement those standards. 3 L. of Envtl. Prot. § 29:130 (2023), Westlaw (database updated April 2023). The Clean Air Act is thus administered by the Environmental Protection Agency (the EPA) in coordination with state, local, and tribal governments. *Id.* New Mexico implements the Clean Air Act through the Air

Quality Control Act, NMSA 1978, §§ 74-2-1 to -17 (1967, as amended through 2021),[1] and a preconstruction permitting program. The Air Quality Control Act provides two relevant ways to procure air quality control permits, through general construction permits for individual sources, § 74-2-7, and through registrations of individual sources pursuant to 20.2.72.220 NMAC.

{4}     The Department granted revisions to an air quality construction permit (the 3 Bear Permit) to 3 Bear Delaware Operating – NM, LLC (3 Bear), for its Libby Gas Plant (the Libby Plant) in Lea County, New Mexico. The Department also approved three registrations under a 20.2.72.220 NMAC general permit. The registrations were filed under the April 2018 General Construction Permit for Oil and Gas Facilities (the General Permit) by XTO Energy Co. (XTO) for its Corral Canyon 23 and Big Eddy Unit DI 38 facilities, and by Spur Energy Partners LLC (Spur) for its Dorami 2H, 4H and 9H Federal Oil Tank Battery (collectively, the Registrations), all of which are located in Eddy County, New Mexico. WildEarth appealed the Department's approval of the 3 Bear Permit and the Registrations to the Board. The appeals were consolidated in front of the Board.

{5}     Prior to the online hearing on WildEarth's appeal, each party filed written direct and rebuttal expert technical testimony. The nine expert witnesses elaborated

---

[1]All citations throughout this opinion to Sections 74-2-1 to -17 are to the 2019 version of the Air Quality Control Act, unless otherwise indicated.

on different aspects of what ozone is and how it forms, measuring ozone through modeling, the cooperative scheme between the Clean Air Act and the Air Quality Control Act, the air quality permitting process, and the specifics of the 3 Bear Permit and the Registrations. The parties then went before the Board for a two-day remote hearing where the experts provided testimony and were cross-examined. The members of the Board were able to ask clarifying questions. The Board also provided the opportunity for public comment. The hearing officer provided a recommendation that the Board affirm the grant of the 3 Bear Permit and the Registrations, and provided the Board a proposed form final order. The Board adopted the hearing officer's recommendation and the hearing officer's form of final order verbatim.

{6}     The Board's final order was thirty-five pages. It reviewed ozone formation, the NAAQS, the nonattainment process and how it relates to New Mexico, ozone regulation in New Mexico, and the public comment. It then reviewed the 3 Bear Permit and the Registrations separately.

{7}     For the 3 Bear Permit, the Board determined that the Department could use a SIL—significant impact level—when determining whether permits such as the 3 Bear Permit cause or contribute to emissions that would violate the NAAQS. The Board then concluded that any minor source of ozone will always be below the SIL and by definition is not considered to cause or contribute to ozone levels in violation of the NAAQS. Thus, because the 3 Bear Permit involved a minor source, the Board

4

determined it was not arbitrary, capricious, or otherwise contrary to law for the Department to determine the 3 Bear Permit would not cause or contribute to concentrations of pollutant in excess of the NAAQS.

**{8}** For the Registrations, the Board addressed the nonattainment requirements of the General Permit. The Board concluded that nonattainment is a status designated by the EPA and, to the extent the regulatory definition used in the General Permit conflicted, the formal designation process takes precedence. Based on that conclusion, the Board determined that it was not arbitrary, capricious, or contrary to law to determine the Registrations' facilities were not located in nonattainment areas.

**{9}** WildEarth appeals the Board's decision. *See* § 74-2-9(A) ("Any person adversely affected by an administrative action taken by the environmental improvement board, the local board, the secretary or the director may appeal to the court of appeals.").

**DISCUSSION**

**{10}** We begin by addressing the statutory and regulatory frameworks required of the Clean Air Act and the Air Quality Control Act. We then address WildEarth's arguments that the Department's use of SILs is improper and that the effect on the 3 Bear Permit and the Registrations requires reversal because they cause or contribute to a violation of the NAAQS. Finally, we turn to WildEarth's argument

that the Registrations were improperly approved because the data shows facilities were located in a nonattainment area.

**I.      Standard of Review**

{11}      Under the Air Quality Control Act, an action of the Board may be set aside by this Court if it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-2-9(C). "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806. When reviewing whether the decision is not supported by substantial evidence under the whole record standard of review, our Supreme Court has instructed that "we look not only at the evidence that is favorable, but also evidence that is unfavorable to the agency's determination." *Fitzhugh v. N.M. Dep't of Labor*, 1996-NMSC-044, ¶ 23, 122 N.M. 173, 922 P.2d 555.

{12}      "The canons of statutory construction guide our interpretation of administrative regulations." *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n*, 2010-NMSC-013, ¶ 51, 148 N.M. 21, 229 P.3d 494. We review statutes and regulations de novo to give effect to the intent of the Legislature, looking to the plain language of the statute, and construing the entire statutory scheme as a whole. *Lujan Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d

545; *Pirtle v. Legis. Council Comm'n*, 2021-NMSC-026, ¶ 14, 492 P.3d 586. "When an agency that is governed by a particular statute construes or applies that statute, the [C]ourt will begin by according some deference to the agency's interpretation." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28. Although not bound by the agency's interpretation, "[t]he [C]ourt will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Id.* (internal quotation marks and citation omitted). "However, the [C]ourt is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law." *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105 (internal quotation marks and citation omitted).

## II.    The Clean Air Act

{13}    Congress enacted the Clean Air Amendments of the Clean Air Act in 1970 as "a comprehensive national program that made the [s]tates and the [f]ederal [g]overnment partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). The amendments require the EPA to designate pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," and then issue air quality

criteria, the NAAQS—national ambient air quality standards. § 7408(a)(1)(A), (a)(2); § 7409(a)(1). The NAAQS are in the form of maximum allowable concentrations in the ambient air during a specified time period. 40 C.F.R. §§ 50.2(b), 50.3. For each pollutant, primary and secondary standards must be set at levels "requisite to protect the public health" and "the public or welfare," respectively. § 7409(b)(1); § 7408(a)(1)(A).

{14}    The NAAQS for ozone are determined "when the 3-year average of the annual fourth-highest daily maximum 8-hour average [ozone] concentration is less than or equal to 0.075 [parts per million (ppm)]." 40 C.F.R. § 50.15(b). Estimating quantities of ozone that a proposed facility will emit is complicated by the fact that ozone is not a direct emission. As we noted above, ozone is created when NOx and VOCs mix in the atmosphere and are acted upon by sunlight, thus it is expensive and difficult to quantify.

{15}    Once a NAAQS designation—for any pollutant, not just ozone—is made, the EPA designates areas as "attainment," "nonattainment," or "unclassifiable" based on the area's compliance with the NAAQS. 42 U.S.C. § 7407(d)(1)(A)(i)-(iii). If the air quality in the area is within the NAAQS, it is designated "attainment." § 7407(d)(1)(A)(ii). If the air quality in the area is not within the NAAQS, it is designated "nonattainment." § 7407(d)(1)(A)(i). Once an area is designated as "nonattainment," it is then designated as a marginal, moderate, serious, severe, or

extreme area. 42 U.S.C. § 7511(a)-(c). If an area is designated "nonattainment," it is subject to stricter permitting requirements. This is a formal designation process and the designations remain in effect until the EPA formally redesignates the area. § 7407(d)(1)(B)(iv), (d)(3).

{16}   The states are primarily responsible for implementing the NAAQS. 42 U.S.C. § 7410. Each state must develop a state implementation plan (SIP) that gives information that satisfies the state's obligations to achieve and maintain the NAAQS. § 7410(a). SIPs must be approved by the EPA. § 4710(a)(3)(B). New Mexico's SIP was approved by the EPA and codified at 40 C.F.R. § 52.1620 (2023).

{17}   Per the Clean Air Act, SIPs must include a program to regulate the construction or modification of "any stationary source . . . as necessary to assure [the NAAQS] are achieved, including a permit program." § 7410(a)(2)(C). A major source is a stationary source that emits or has the potential to emit any pollutant over specified annual thresholds, which are 100 tons per year (tpy) or 250 tpy depending on the type of source. 42 U.S.C. § 7479(1). A stationary source is a major source of ozone if it emits 250 or more tpy because ozone is not specifically listed in the statute. *Id.* Major sources are significant to our analysis in that they require more stringent requirements than nonmajor (minor) sources. Major sources must obtain a preconstruction permit. 42 U.S.C. § 7475(a)(1). A permit for a major source cannot be granted unless "construction or operation of such facility will not cause, or

9

contribute to, air pollution in excess of any . . . [NAAQS] in any air quality control region." § 7475(a)(3).

{18} The preconstruction permitting program for attainment areas is called the Prevention of Significant Deterioration Program (PSD). 42 U.S.C. § 7470; 40 C.F.R. § 51.166(b)(42) (2023); 40 C.F.R. § 52.21(a)(2)(i) (2023). EPA regulations require each state's SIP to set forth "legally enforceable procedures that enable the [s]tate or local agency to determine whether the construction or modification of a facility, . . . will result in . . . [i]nterference with attainment or maintenance of [the NAAQS]." 40 C.F.R. § 51.160(a)(2) (2023). "The procedures must discuss the air quality data and the dispersion or other air quality modeling used to meet the requirements of this subpart." 40 C.F.R. § 51.160(f).

## III.  New Mexico's Air Quality Control Act

{19} The Air Quality Control Act, §§ 74-2-1 to -17, is our state's response to the requirements of the Clean Air Act. Section 74-2-5(C)(1)(a) states that the rules adopted by the Board may "include rules . . . to prevent significant deterioration of air quality[,] and to achieve [NAAQS] in nonattainment areas: . . . [and] shall be no more stringent than but at least as stringent as required by the federal act and federal regulations . . . pertaining to prevention of significant deterioration and pertaining to nonattainment areas."

{20}    The Air Quality Control Act requires any "person intending to construct or modify any source," to obtain an air quality construction permit. Section 74-2-7(A)(1). New Mexico has regulations that apply to all construction permits, 20.2.72.2 NMAC, regulations that apply to major source permits in attainment areas, 20.2.74.2 NMAC, and regulations that apply to permits in nonattainment areas. 20.2.79.6 NMAC. Like the Clean Air Act, § 7479(1), the Air Quality Control Act defines a major source of ozone as one, which emits 250 tpy or more of pollutant—which means that minor sources of ozone emit less than 250 tpy of pollutants. 20.2.74.7(AG)(2) NMAC; 20.2.74.501 NMAC. Per our regulations, NMED "shall deny any application for a permit," whether it be for a minor or major source, if "[t]he construction, modification, or permit revision will *cause or contribute* to air contaminant levels in excess of any [NAAQS] . . . unless the ambient air impact is offset by meeting the requirements of either 20.2.79 NMAC or 20.2.72.216 NMAC, whichever is applicable." 20.2.72.208(D) NMAC (emphasis added).

{21}    Outside of the regular construction permitting process, the Board's regulations grant the Department the authority to issue general construction permits. Regulation 20.2.72.220(A)(1) of the New Mexico Administrative Code states:

> The department may, after notice under Subsections A and B of 20.2.72.206 NMAC and a public hearing with opportunity for public participation under Subsection C of 20.2.72.206 NMAC issue one or more general construction permits, each covering numerous similar sources. Sources registered for coverage under a general permit shall be generally homogeneous in terms of operations, processes and

11

> emissions, subject to the same or substantially similar requirements, and not subject to case-by-case standards or requirements.

The Department is thus authorized to issue general construction permits that cover numerous similar sources—what the Department individually calls registrations—so long as the Board follows the regulatory scheme. 20.2.72.220 NMAC. The requirements for general construction permits are at 20.2.72.220 NMAC. The regulation requires all sources registered under general permits to include terms and conditions assuring that the registration "will not cause or contribute to air containment levels in excess of any national or New Mexico ambient air quality standard." 20.2.72.220(A)(2)(c)(i) NMAC.

{22}   The Department spent a significant amount of time in their technical written expert testimony, proposed findings of facts and conclusions of law, briefing to this Court, and in oral argument describing efforts the Department is making to curb ozone pollution outside of the permitting process. These ozone initiatives are separate from the permitting issues at hand. We need not review them.

**IV.   Significant Impact Levels**

{23}   Noting that air quality monitor readings in Lea and Eddy counties are already measuring ozone levels above the NAAQS, WildEarth argues that the Board erred as a matter of law when it concluded that the Air Quality Control Act and the Board's regulations do not impose a zero-tolerance standard for emissions from sources located in areas with ozone levels measuring air quality in violation of the NAAQS.

12

3 Bear, Spur, and XTO (collectively, the Permittees) and the Department responded that the Air Quality Control Act and the Board's regulations allow the use of a SIL, a de minimis increase of air contaminant levels that does not violate the "cause or contribute to" standard of the NAAQS. Thus, the meaning of "cause or contribute to" is at the core of this appeal. We agree with the Department and the Permittees.

{24} Per the Air Quality Control Act, an application for a permit may be denied if the construction "will cause or contribute to air contaminant levels in excess of a national or state standard." Section 74-2-7(C)(1)(b). According to the Board's regulations, an application for a permit shall be denied if "[t]he construction, modification, or permit revision will *cause or contribute to* air contaminant levels in excess of any [NAAQS] or New Mexico ambient air quality standard unless the ambient air impact is offset by meeting the requirements of either 20.2.79 NMAC or 20.2.72.216 NMAC, whichever is applicable." 20.2.72.208(D) NMAC (emphasis added).

{25} There is no disagreement among the parties that the wording "cause or contribute to" is based on language in the Clean Air Act addressing permitting requirements for major sources of emissions. § 7475(a)(3). We are aware that while the State's minor source permitting rules must be approved by the EPA, the Clean Air Act does not dictate specific elements for minor source permitting programs. § 7410(a)(2)(C). Despite the lack of specific federal direction, we conclude that

13

authorities construing the Clean Air Act and the EPA's regulations and interpretation of the language are instructive for our analysis of New Mexico's identical wording. *See State v. Chavez*, 2023-NMCA-071, ¶ 30, 535 P.3d 736 (relying on federal authority as persuasive authority when the federal rule was substantially similar to the state rule).

{26} There also appears to be no disagreement among the parties that the EPA has historically interpreted the "cause or contribute to" language to connote that emissions from a source must have a significant impact on air quality in order to result in a denial of a permit. As 3 Bear's expert witness testified, the EPA has been using SILs since at least 1990 when it issued the *New Source Review Workshop Manual—Prevention of Significant Deterioration and Nonattainment Area Permitting* (Oct. 1990) (1990 NSR Workshop Manual), https://www.epa.gov/sites/default/files/2015-07/documents/1990wman.pdf. Though it is guidance for the PSD program—the permitting program for major sources in attainment areas—the 1990 NSR Workshop Manual included a SIL. 1990 NSR Workshop Manual, ch. A, § I. at A.1; § II.C.2 at A.24-25. The EPA's longstanding approval of the use of a SIL when assessing whether emissions cause or contribute to air contaminant levels in excess of the NAAQS is therefore demonstrated by the EPA's historical guidelines.

{27} The EPA's interpretation has been examined in a number of cases. For example, in *Alabama Power Co. v. Costle*, 636 F.2d 323, 404-05 (D.C. Cir. 1979),

14

the court disapproved of the EPA's regulatory approach to implementing the idea that de minimis effect may be administratively recognized and dealt with by reducing the burden of proof imposed on significant sources. *Id.* at 405. But, the court recognized and approved of the idea of defining de minimis standards and applying them to reduce administrative burdens on the EPA. *Id.* Similarly in *Sur Contra La Contaminacion v. Environmental Protection Agency*, 202 F.3d 443, 446-47 (1st Cir. 2000), the EPA had allowed a permit applicant to forgo a "full impact analysis" of its potential sulfur dioxide emissions. The EPA relied on a provision in the PSD permit process that allowed skipping a full analysis if the air quality modeling technique indicated that emissions "would not increase ambient concentrations by more than prescribed significant ambient levels." *Id.* at 446. And, in *WildEarth Guardians v. Jackson*, 870 F. Supp. 2d 847, 850-51 (N.D. Cal. 2012), the court specifically approved of the EPA's adoption of "de minimis thresholds which set specific values, in relation to each pollutant's NAAQS, below which the pollutant is not considered to cause or contribute to a violation of the NAAQS."

{28}    *In re Prairie State Generating Co.*, 13 E.A.D. 1, 4-5 (Aug. 2006) (order denying review), https://yosemite.epa.gov/oa/eab_web_docket.nsf/CAA~Decisions/7414685644289CEB8525 71D4006785E2/$File/Prairie%20State.pdf, involved a challenge to the EPA's environmental appeals board from a permit issued by the state of Illinois for a 1500-megawatt pulverized coal-fuel powered electricity generating plant. Among many

15

other issues, the appellants challenged the use of SILs, arguing—as WildEarth does here—that the Clean Air Act "does not use the term 'significant'" and that it was error to read the term into the statute. *Id.* at 100-01. Noting the EPA's longtime use of SILs, the Board rejected the argument, observing that "Read in context, the requirement of an owner . . . to demonstrate that emissions from a proposed facility will not 'cause, or contribute to' air pollution in excess of a NAAQS standard must mean that some non-zero emission . . . is permissible, otherwise such a demonstration could not be made." *Id.* at 104; *see also Blue Skies All. v. Tex. Comm'n on Env't Quality*, 283 S.W.3d 525, 531 (Tex. Ct. App. 2009) (rejecting the argument that there is no de minimis level for ozone and holding that an interpretation of "cause or contribute to" that allows extremely low levels of ozone precursors without legally violating the standard is "reasonable, consistent, and strikes an appropriate balance between protecting air quality and encouraging economic growth").

{29}     The New Mexico Air Quality Bureau published, Sufi Mustafa, et al., *Air Dispersion Modeling Guidelines* (June 6, 2019) (NM Dispersion Guidelines), https://www-archive.env.nm.gov/wp-content/uploads/sites/2/2017/01/NM_AirDispersionModelingGuidelines_6June2019.pdf in June 2016. The NM Dispersion Guidelines include SILs that it defines as "thresholds below which the source is not considered to contribute to any predicted

16

exceedance of air quality standards." NM Dispersion Guidelines, 2.4.1 at 17. If the source contributes less than that level, the NM Dispersion Guidelines determine that it does not "cause or contribute to" levels in excess of the NAAQS. *Id.* The ozone SIL is 1.0 part per billion (ppb), which is equivalent to 1.96 milligrams per cubic meters (µg/m3). NM Dispersion Guidelines, § 2.6.5 at 24.

{30}     The SIL used in the NM Dispersion Guidelines is based on guidance from the EPA on SILs for ozone. *Id*. (citing Memorandum from Peter Tsirigotis, Director, U.S. Env't Prot. Agency, to Regional Air Division Directors, Regions 1-10 (April 17, 2018) (EPA SIL Guidelines), https://www.epa.gov/sites/default/files/2018-04/documents/sils_guidance_2018.pdf).

{31}     While we review an administrative agency's legal conclusions for errors of law, *Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17, we defer to the Department's interpretation of the Board's rules unless that interpretation is plainly erroneous or inconsistent. *Morningstar Water Users Ass'n*, 1995-NMSC-062, ¶ 11. Interpreting the cause and contribute standard to include a SIL—though it is not in the plain language of the regulation—is reasonable and consistent with the Board's guidelines and the EPA's interpretation of the standard. *See N.M. Real Estate Comm'n v. Barger*, 2012-NMCA-081, ¶ 7, 284 P.3d 1112 ("[W]here the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according

17

to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others." (internal quotation marks and citation omitted)).

{32}     Given these authorities, we conclude that the use of SILs in the administration of the Air Quality Control Act and the Board's identical regulatory language is allowable and the Board did not commit a legal error in so holding. The issue then becomes whether the Board used the SIL concept appropriately. We thus turn to the specific circumstances of this case.

**A.     The 3 Bear Permit Was Not Improperly Granted**

{33}     WildEarth argues that even if using a SIL is permissible, the SIL was not used appropriately when assessing the 3 Bear Permit. First, it argues the Department failed to follow the EPA SIL Guidelines by not justifying why it was using the SIL. Second, WildEarth argues that the Department erred when it automatically assumed any ambient impact below the SIL did not "cause or contribute to" ozone NAAQS exceedances. Third, it argues substantial evidence does not support the finding that minor source emissions are necessarily below the SIL.

{34}     We start by noting that the EPA SIL Guidelines are designed to be used as a tool for assessing emissions from major sources in attainment areas. EPA SIL Guidelines (memo). The 3 Bear Permit involves a minor source in a designated attainment area. Permitting requirements are more stringent for major sources. Further, the EPA SIL Guidelines are clear that they "are not final agency actions and

18

do not create any binding requirements on permitting authorities, permit applicants or the public." EPA SIL Guidelines (memo). The EPA SIL Guidelines' suggestion that "permitting authorities use their discretion to apply and justify the application of the SIL values . . . on a case-by-case basis in the context of individual permitting decisions," *id.*, attach. at 2, is not binding on this Court's assessment of the 3 Bear Permit.

{35} The Department did explain its decision to apply the EPA's ozone significance impact level to its minor source permitting process. The Department's witnesses explained the complexity and prohibitive cost of full scale modeling for ozone creation, as well as the fact that such modeling is normally done on a regional basis. The Department's and Permittees' expert witnesses also justified that hypothetical ozone concentration levels from minor source emissions using the EPA's Modeled Emission Rates for Precursors (MERPs) tool demonstrated that they would not exceed the 1.0 ppb SIL for ozone. This testimony is sufficient to support the Department's use of SILs.

{36} The more fundamental issue is whether the Department—or the Board— improperly created and applied a presumption that no minor source could ever potentially exceed the ozone SIL.

{37} As noted above, the Department's witnesses explained why application of the EPA's ozone SIL was appropriate. But, no witnesses alluded to any formal—or

informal—internal procedure consciously adopted by the Department memorializing the conclusion that minor sources cannot "cause or contribute to" a violation of the ozone NAAQS. The testimony was only that there was a "general awareness" on the part of the staff. It thus appears at best to be a rule of practice or thumb within the Department. Nevertheless, the Board's final order concluded as a matter of law that

> 102. Pursuant to EPA guidance, NMED guidance, and the Board's permitting regulations at 20.2.72 and 20.2.74 NMAC, a permit applicant for a minor source is not required to make an individual demonstration of its impacts on ambient ozone concentrations.

> 103. Application of EPA modeling guidance establishes that sources in Lea and Eddy County whose emissions of ozone precursor pollutants are below 250 tpy will be below the [SIL] for ozone.

> 104. Because their impacts are below the SIL for ozone, minor sources by definition do not "cause or contribute to" ozone concentrations in excess of the NAAQS.

> 105. The Department does not have authority or discretion to deny a permit or require offsets for an individual new or modified minor source in a designated attainment area on the basis that the facility will "cause or contribute" to ozone levels above the NAAQS.

{38} These conclusions of law create an apparent irrebuttable presumption that no minor source of ozone precursor emissions can cause or contribute to a violation. We determine that the Board erred because there is no substantial evidence supporting its order in this regard and because they run against the grain of case law addressing the proper use of SILs.

20

{39} First, we agree with WildEarth that the testimony provided by the Department's witnesses was too conclusory to support the Board's conclusion of law. The testimony from the Department's witnesses concerning the complexity and cost of full-scale modeling was sufficient to support the use of the SILs. But, the witnesses did not provide any detail concerning the results or methodology of the pro forma hypothetical modeling they relied on to assert that minor sources could not cause or contribute to violations. When asked whether it is the "Department's position that a minor source will never be considered as contributing to an ozone violation," the Department's witness Bisbey-Kuehn responded, "We don't know the answer to that question. The—there are—EPA has issued guidance on how to estimate individual source impacts from major sources of air pollution. They have not provided that guidance to any regulatory agency on how to estimate those impacts from individual minor source facilities." If the answer to the question is unknown to the EPA and the Department, we fail to see how the Board could conclude as a matter of law that minor sources "by definition" do not cause or contribute to concentrations in excess of the NAAQS.

{40} It is even more problematic for the Board to conclude as a matter of law that the Department "does not have authority or discretion to deny a permit . . . for an individual new or modified minor source in a designated attainment area on the basis that the facility will 'cause or contribute' to ozone levels above the NAAQS." The

21

Department maintained at oral argument that this finding dealt only with the lack of "discretion of the Department to apply nonattainment permitting requirements to sources that are located in a designated attainment area." If taken at face value, however, as WildEarth argues, this decision would act as an exemption from regulation and would allow the Department and permit applicants to stop considering ozone minor source issues entirely.

{41} The ruling is reminiscent of the approach the EPA took to SILs in the first iteration of the EPA SIL Guidelines. In *Sierra Club v. Environmental Protection Agency*, 705 F.3d 458, 459-60 (D.C. Cir. 2013), the court construed an EPA regulation establishing a SIL for particulate matter. As part of its regulation, the EPA provided that a source that did not exceed the SIL at its locations would not be "required to conduct more extensive air quality analysis or modeling to demonstrate that its emissions, in combination with the emissions of other sources in the vicinity, will not cause or contribute to a violation of the NAAQS at that location." *Id.* at 461 (internal quotation marks and citation omitted). As part of the litigation on appeal, the EPA conceded that it had gone too far in creating an exemption from "certain requirements under § 165 of the [Clean Air] Act." *Sierra Club*, 705 F.3d at 459-60. The court held that the EPA did not have authority to exempt a source from regulation simply because the source's emissions were below a predetermined level. *Id.* at 466, 468.

{42}    The Board's ruling with regard to ozone minor source precursors has the same effect and is improper for the same reason. We thus disapprove of and vacate paragraphs 102, 103, 104, and 105 of the Board's final order. We emphasize, however, that this does not mean that minor source applications will be required to do modeling equivalent to major sources. It does mean that the Department and permit applicants will be required to perform at least pro forma or hypothetical calculations using the MERPs tool and the Department's own NM Dispersion Guidelines or some other tool that similarly hypothesizes emissions. We note that the Department's expert Mustafa concluded that the Department had not performed this otherwise routine analysis when it considered the 3 Bear Permit.

{43}    The question remains whether substantial evidence supports the Board's finding that the 3 Bear Permit was properly issued. As WildEarth acknowledged at oral argument, the NM Dispersion Guidelines do not require full-scale modeling analysis for minor sources. NM Dispersion Guidelines, 2.1.2 at 10; 2.2 at 12; 2.6.5 at 24. However, not requiring modeling does not absolve the Department and 3 Bear from demonstrating that the 3 Bear Permit's emissions would be below the SIL.

{44}    To demonstrate the 3 Bear Permit's emissions are below the SIL for ozone, the Board relied on the application of the Department's MERPs tool. The Department's expert Mustafa testified that the MERPs "uses a complex photochemical modeling of a hypothetical facility and applies the results to estimate

23

the impacts of emissions from a proposed facility." The Board relied on testimony from the Department's expert Bisbey-Keuhn during her written rebuttal testimony when she testified

> MERP[s] are applied to facility emissions of NOx and VOCs as multiplicative factors to estimate the facility ozone impacts. Because ozone formation chemistry is highly sensitive to local atmospheric conditions and concentrations of atmospheric species, these multiplicative factors were produced by EPA for several "hypothetical sources" modeled across the country. The multiplicative factors for the three "hypothetical sources" closest to the facilities at issue in these appeals require that over 250 [tpy] of NOx or VOCs be emitted from a facility before the ozone impacts from the facility are considered to be above the [SIL] for ozone. The permits at issue in these appeals are all are minor sources; none of those facilities emit NOx or VOC[s] above 250 [tpy] each. Therefore, under the approach advocated by [WildEarth's expert witness], these sources cannot be considered to significantly contribute to ozone concentrations.

This is also the evidence the Department referenced in oral arguments when it was asked for evidence to support the Board's finding.

{45}    This testimony is not sufficient by itself to demonstrate that all minor source emissions of ozone will be below the SIL. A minor source is measured in tons per year, which demonstrates the amount of ozone precursor a facility will emit. The SIL is measured in parts per billion, which demonstrates the increase in the concentrations of pollutant in the ambient air. The Department fails to link the two measurements other than through conclusory testimony. The Department also presents no evidence of what the hypothetical sources are, their emission rates, or what calculations were used to establish that all minor sources will lead to emission

24

rates below the SIL. In fact, the 3 Bear experts testified that "[u]sing the MERPs guidance for all theoretical sources in the Continental United States, the minimum level of NOx emissions with a significant impact is 125 tpy and the minimum level of VOC[s] emissions with a significant impact is 1,039 tpy." This testimony, in contrast to the Department's assertions, though similarly conclusory, demonstrates that at least within the Continental United States, the MERPs modeling shows that some minor sources of NOx—those between 125 tpy (the MERP measurement) and 250 tpy (the threshold for a major source)—may result in an increase in emissions above the SIL. *See Bass Enters. Prod. Co. v. Mosaic Potash Carlsbad Inc.*, 2010-NMCA-065, ¶ 28, 148 N.M. 516, 238 P.3d 885 (noting that for substantial evidence whole record review, "favorable evidence is not viewed in a vacuum that disregards contravening evidence"). We will not rely on the Department's expert testimony that all minor sources of ozone result in emissions below the SIL when the experts do not—for lack of a better term—show their work. *See Herman v. Miners' Hosp.*, 1991-NMSC-021, ¶ 6, 111 N.M. 550, 807 P.2d 734 ("To determine whether a finding of fact is amply supported by the whole record, we do not rely solely on one part of the evidence if to do so would be unreasonable. We must find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." (internal quotation marks and citation omitted)).

{46}    However, 3 Bear's experts did show their work by tying their measurements to their conclusion through use of reported data. In their written rebuttal testimony, the 3 Bear experts Bennett and Marquez used the hypothetical source in Terry County, Texas, which was "most representative" of Lea and Eddy counties. They explained that they considered using a hypothetical source in New Mexico but chose not to because the source they used was closer to the Libby Plant and had a similar elevation. Using this representative source in Terry County within the Permian Basin, they used the MERPs calculation, and demonstrated that the estimated impacts of the 3 Bear Permit were 5 percent of the SIL. Since the hypothetical modeling demonstrates that the 3 Bear Permit's ozone emissions are below the SIL, substantial evidence demonstrates that the 3 Bear Permit will not cause or contribute to an increase in the ozone NAAQS.

**B.    The Registrations Were Not Improperly Granted**

{47}    WildEarth asserts that the General Permit requires the Department to deny the registrations if the construction will lead to an exceedance of the NAAQS. It argues that since no evidence was presented regarding the Registrations' emissions, it was err to grant the Registrations.

{48}    We reiterate that the General Permit is a general construction permit. The General Permit, as a general construction permit, allows similar sources to register under it in lieu of applying for a general construction permit so long as the Board

follows the regulatory scheme. *See* 20.2.72.220 NMAC. Registrations under the General Permit must meet the requirements of the Air Quality Control Act and "not cause or contribute to air containment levels in excess of any national or New Mexico ambient air quality standard." *See* 20.2.72.220(A)(2)(c)(i) NMAC. In order to apply for a registration under the General Permit, the maximum possible emission rates are 95 tpy of each NOx and VOCs. The General Permit states, "The Department shall deny a [r]egistration [f]orm if: . . . [a]ny criteria listed in 20.2.72.208 NMAC is applicable." It goes on to state, "The permittee shall comply with all applicable sections of the requirements listed in Table 103," and Table 103 includes the "20.2.72 NMAC Construction Permit."

{49}    Section B100 of the General Permit also states,

> The Department has determined that all facilities registered under and operating in accordance with this permit will meet all applicable requirements under the federal Clean Air Act, the New Mexico Air Quality Control Act, and Title 20, Chapter 2 NMAC, including 20.2.74 NMAC (Prevention of Significant Deterioration), 20.2.77 NMAC (New Source Performance Standards), 20.2.78 (Emission Standards for Hazardous Air Pollutants), 20.2.82 NMAC (Maximum Achievable Control Technology Standards for Source Categories of Hazardous Air Pollutants), and *will not cause or contribute to air contaminant levels in excess of any national or New Mexico ambient air quality standard*.

(Emphasis added.)

{50}    The language of the General Permit has two sections that can be read to be at odds with each other. One requires compliance with the NAAQS, while the other seems to establish as fact that any registration under the General Permit complies

27

with the NAAQS. The Department failed to include anything in the record proper or make argument to this Court that addresses this seeming contradiction, explains what was presented during the process to establish the factual assertions that were made in the General Permit, or demonstrates the approval process for the General Permit. As such, our review is inhibited. This is not to say that including this information would make it possible for WildEarth or another party to challenge the General Permit. *See* 20.2.72.220(C)(5) NMAC ("[A]dministrative review of a registration for coverage under a general construction permit shall not extend to administrative review of the general permit itself. Administrative review of the general construction permit shall be available under Section 74-2-7[(H)-(L)] only upon issuance or revision of the general permit as a permitting action."). However, providing context would have aided this Court in assessing the validity of WildEarth's claims.

{51}     But we digress. The evidence in the record demonstrates—and WildEarth does not dispute—that the Registrations were for emissions of NOx and VOCs that were 95 tpy or less. In the technical rebuttal testimony of Spur's expert witness, the expert explained and demonstrated that inputting the max NOx and VOCs rates permitted under the General Permit—95 tpy—into the ozone concentration equation increased the ambient air concentration 1.19 µg/m3, which is under the NM Dispersion Guidelines' 1.96 µg/m3 SIL for ozone. *See* NM Dispersion Guidelines, 2.65 at 24. Thus, evidence in the record demonstrates that the emissions of NOx and

28

VOCs from the Registrations provides a change in air quality below the SIL—and do not cause or contribute to air contaminant levels in excess of the NAAQS, as we determined above. Such evidence also contradicts WildEarth's assertion that no evidence in the record addresses the General Permit's 20.2.72.208(D) NMAC requirements. Based on that, we need not address any conflict within the General Permit in reference to compliance with the NAAQS.

**V.      The Registrations Are Not Located in a Nonattainment Area**

{52}     WildEarth's final argument is that the General Permit does not allow registrations for facilities located in areas of nonattainment. The parties agree that monitor readings at the time reflected ozone levels exceeding the NAAQS. WildEarth argues that these reflect that the area is in "actual" nonattainment and thus the Registrations were improperly approved. The Department argues that the regulatory definition of nonattainment used in the General Permit is at odds with the statutory definition of nonattainment and cannot be enforced. They also argue that "nonattainment" is a formal designation made by the EPA that can only be changed by the EPA. We agree with the Department and the Permittees.

{53}     The General Permit states that a registration shall be denied if "[t]he Facility is located in a nonattainment area [defined by 20.2.72.216 and 20.2.79 NMAC (6/3/2011)]." A nonattainment area as defined by 20.2.79.7(AA) NMAC (6/3/2011) "means, for any air pollutant an area which is shown by monitored data or which is

29

calculated by air quality modeling (or other methods determined by the administrator to be reliable) to exceed any [NAAQS] for such pollutant. Such term includes any areas identified under Subparagraphs (A) through (C) of § 107(d)(1) of the . . . Clean Air Act." We note that this definition of nonattainment is consistent with the Clean Air Act's definition of nonattainment before the Clean Air Act underwent significant amendments in 1990. The Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 171(2), 91 Stat. 685 (codified as amended at 42 U.S.C. § 7501). We cannot simply apply the plain language of the regulation, however, without addressing more recent amendments to the federal and state statutory scheme. *See Martinez v. Cornejo*, 2009-NMCA-011, ¶ 11, 146 N.M. 223, 208 P.3d 443 (recognizing that our courts may depart from the plain meaning rule to avoid a formalistic and mechanical statutory construction that would be absurd, unreasonable, or contrary to the spirit of the statute).

{54}    As we noted above, once a NAAQS designation is made, the EPA designates an area as "attainment" or "nonattainment." § 7407(d)(1)(A)(i)-(ii). Once an area is designated as "nonattainment" for ozone, it is designated as marginal, moderate, serious, severe, or extreme. § 7511(a)-(c). The Air Quality Control Act defines nonattainment as "an area that is designated 'nonattainment' with respect to that contaminant within the meaning of Section 107(d) of the federal act." Section 74-2-2(N). Further, Section 74-2-5(C)(1)(a) requires that the rules for the prevention of

30

significant deterioration of air quality and to achieve NAAQS in nonattainment areas be "no more stringent than but at least as stringent as required by the federal act and federal regulations."

{55} Reading the Clean Air Act together with the Air Quality Control Act, it is evident that designating an area as attainment or nonattainment is a formal designation process implemented by the EPA. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (noting that when "several sections of a statute are involved, they must be read together so that all parts are given effect"). It is also apparent that the Legislature intended to follow the EPA's designation process. Thus, any reference in the Board's regulation at 20.2.79.7(AA) NMAC (6/3/2011) to nonattainment being defined by monitored data is inconsistent with the federal statute. *Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 10, 140 N.M. 49, 139 P.3d 209 ("Where a statute and a regulation are inconsistent, the statute will prevail."); *N.M. Bd. of Pharmacy v. N.M. Bd. of Osteopathic Med. Exam'rs*, 1981-NMCA-034, ¶ 8, 95 N.M. 780, 626 P.2d 854 ("An administrative agency has no power to create a rule or regulation that is not in harmony with its statutory authority.").

{56} WildEarth argues that the Board's regulations take into account that the regulatory nonattainment definition is broader than the statutory definition of nonattainment because the permitting requirements do not use the broader

nonattainment definition, so "applying the [Board]'s expansive regulatory definition does not result in any substantive outcome inconsistent with statutory requirements." In doing so, WildEarth acknowledges that the regulatory definition of nonattainment is broader than the statutory definition. However, it argues that because the regulatory definition is not used in the major source permitting process that directly references federal law, we can simply ignore the Board's exertion of power it does not have. This we cannot do. *See N.M. Bd. of Pharmacy*, 1981-NMCA-034, ¶ 8. As the Board had no authority to define nonattainment more broadly than the statute's definition, it had no authority to enforce the General Permit's requirement that a registration not be permitted in an area that is "shown by monitored data or which is calculated by air quality modeling . . . to exceed any [NAAQS]." *See* 20.2.79.7(AA) NMAC (6/3/2011).

{57}     WildEarth argues that the Board's failure to follow the plain language of the nonattainment definition in 20.2.79.7(AA) NMAC (6/3/2011), amended the General Permit without following the proper administrative procedure. WildEarth also argues that it is not challenging the regulatory definition or its application, but the Board's approval of specific registrations in an area where, by the terms of the General permit, such permits are unavailable. Both of these arguments are undercut by the fact that, as we determined above, the Board did not have authority to enforce such a definition. *See N.M. Bd. of Pharmacy*, 1981-NMCA-034, ¶ 8.

32

**CONCLUSION**

{58} For the foregoing reasons, we affirm the Board's approval of the 3 Bear Permit and the Registrations. We disapprove of paragraphs 102-105 of the Board's final order and remand the matter with instructions that they be redacted from the order.

{59} **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge,
retired, Sitting by designation**

**WE CONCUR:**

_____
**MEGAN P. DUFFY, Judge**

_____
**KATHERINE A. WRAY, Judge**